Lucy McDONALD, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 80–1070.

United States District Court, M.D. Pennsylvania.

Jan. 31, 1983.

Joseph A. Quinn, Jr., Hourigan, Kluger & Spohrer, Assoc., Wilkes-Barre, Pa., Clifford J. Shoemaker, Washington, D.C., for plaintiff.

James W. Walker, Asst. U.S. Atty., Scranton, Pa., for defendant.

## OPINION

CONABOY, District Judge.

Plaintiff Lucy McDonald instituted this action pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671 *et seq.* (1976), and the National Swine Flu Immunization Program of 1976 (Swine Flu Act), formerly codified at 42 U.S.C. § 247b(j)–(*l*) (1976),[1] seeking to recover compensatory damages for injuries allegedly suffered as a result of her inoculation with the swine influenza vaccine.[2] The case was filed with

---

1. The Swine Flu Act no longer appears in Title 42, *See* Health Services and Centers Amendments of 1978, Pub.L. No. 95–626, 92 Stat. 3551. All citations herein are to the section as it read prior to the 1978 amendment.

2. Francis McDonald's claim was dismissed before trial by the multidistrict court for failure to file an appropriate administrative claim, a jurisdictional prerequisite under the Federal Tort Claims Act. 28 U.S.C. § 2675(a); see *Rise v. United States,* 630 F.2d 1068 (5th Cir.1980).

938

this Court on September 25, 1980, and subsequently transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407 (1968). Following the entry of a Stipulation and Final Pretrial Order, the case was remanded to this Court for further proceedings on November 9, 1981. A non-jury trial was held from December 13 to 29, 1982 and, in accordance with the Court's directive of December 29, 1982, the parties have each filed post-trial submissions.

## I. SUMMARY OF CONTENTIONS AND HOLDING

The central issue involved here is the diagnosis of the Plaintiff's neurological disorder. The Plaintiff's primary contention is that she is suffering from Guillain-Barre Syndrome (GBS) caused by the swine flu inoculation she received on November 14, 1976. The Defendant's position is that the Plaintiff's illness is not GBS, but Transverse Myelitis (TM), a disease of the spinal cord, which the Defendant contends has no causal relationship to the swine flu vaccine.

As the medical testimony developed at trial, it was apparent to the Court that there exists in the neurological field two schools of thought on the symptomatology of the GBS disorder. There was general agreement among the medical experts that GBS is primarily a disease of the peripheral nervous system. There was much controversy, however, as to whether this disease can also involve the central nervous system, particularly the spinal cord, and if so, to what extent. The Plaintiff's view is that even the presence of significant spinal cord involvement, albeit it was asserted that there was only a minor degree in this case, would not rule out the diagnosis of GBS; whereas the Defendant's experts were inclined to conclude that where there are demonstrable physical findings signifying more than minimal spinal cord involvement, then the neurological disease process could not properly be termed GBS.

Endeavoring to fulfill the Court's judicial duty to render a precise determination in an area of medical science which the trial testimony has shown to be characterized by inexactness and controversy, we have objectively reviewed the scholarly medical testimony presented, both at trial and by deposition, and the numerous articles of medical literature concerning the Guillain-Barre Syndrome, transverse myelitis, and the swine flu vaccine. After a comprehensive examination and consideration of all these evidentiary sources, the Court finds that the Plaintiff developed GBS as a proximate result of her swine flu inoculation; and is entitled to recover from the Defendant for the damages she has suffered.

The following constitutes the Court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## II. INTRODUCTION

The National Swine Flu Immunization Program of 1976 was an attempt by the federal government to inoculate the entire adult population of the United States against the perceived threat of a swine flu epidemic. From its commencement on October 1, 1976 until its suspension on December 16, 1976, over forty-five million Americans were vaccinated, resulting in the largest immunization program ever in this country's history. See *Administration of the National Influenza Immunization Program of 1976*, Final Report to Congress by Department of Health, Education and Welfare (1978). The historical genesis of this mass inoculation effort and the legislative response thereto has been exhaustively discussed on numerous occasions by other courts and commentators and need not be repeated here. See *Hunt v. United States*, 636 F.2d 580, 589–593 (D.C.Cir.1980); *Unthank v. United States*, 533 F.Supp. 703, 716–21 (D.Colo.1982); *Bean v. United States*, 533 F.Supp. 567, 571–72 (D.Colo. 1980); Baynes, *Liability for Vaccine Related Injuries: Public Health Considerations and Some Reflections on the Swine Flu Experience*, 21 St. Louis L.J. 44, 62–69 (1977).

With respect to liability for personal injuries and deaths arising from the program, the Swine Flu Act contained the following relevant procedural provisions:

1) The Act created a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of the program participant[3] upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty. 42 U.S.C. § 247b(k)(2)(A).

2) The Swine Flu Act made the above cause of action the exclusive remedy and abolished any causes of action against the vaccine manufacturer by individual claimants. 42 U.S.C. § 247b(k)(3).

3) It made the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act. 42 U.S.C. § 247b(k)(4).

On a substantive level, to be entitled to a monetary recovery under the Act, a plaintiff must establish by the fair weight or preponderance of the evidence: (1) the nature of his or her illness; (2) a causal nexus with the swine flu vaccine; (3) a theory of liability against the government or program participant, *i.e.,* strict liability, negligence, or breach of warranty; and (4) damages. However, under the terms of the final pretrial order entered by the Multidistrict court, Plaintiffs who can establish that they contracted Guillain-Barre Syndrome after receipt of the swine flu vaccine need not establish a theory of liability; only causation and damages must then be proven. See *In Re Swine Flu Immunization Products Liability Litigation,* Final Pretrial Order paragraph IX, M.D.L. No. 330, Misc. No. 78–0040 (J.P.M.D.L.1979).[4]

As previously noted, Plaintiff's main contention is that she is suffering from GBS caused by the swine flu vaccine. Alternatively, she argues that even if the Court finds her present neurological disorder is transverse myelitis, as the Defendant contends, this disease process is the result of the swine flu vaccine. Furthermore, the Plaintiff posits various theories of liability against the government in support of this alternative argument.[5] The government's position, as set forth above, is that the Plaintiff is physically disabled not from GBS but rather from a transverse myelitic lesion of the spinal cord which has no causal relationship to the swine flu vaccine.

### III. PLAINTIFF'S PERSONAL AND MEDICAL HISTORY

Lucy McDonald, presently 39 years old, was born on May 3, 1943 in Pittston, Pennsylvania. She is a high school graduate and was awarded an academic scholarship to College Misericordia in Dallas, Pennsylvania. Her intention of becoming a teacher was interrupted when she was forced to withdraw after one academic year to care for her parents, who were both in ill health. Her father died in 1962 from heart-related complications and her mother passed away in 1968.

---

3. Under the Swine Flu Act, the term "program participant" applied to any:

   "manufacturer or distributor of the swine flu vaccine used in an inoculation under the swine flu program, the public or private agency or organization that provided an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with the informed consent form and procedures requirements prescribed ... and the medical and other health personnel who provided or assisted in providing an inoculation under the swine flu program without charge for such vaccine or its administration and in compliance with such informed consent form and procedures requirements." 42 U.S.C. § 247b(k)(2)(B).

4. Specifically, this section of the pretrial order provided that:

   "Where the United States contests that the illness is in fact Guillain-Barre Syndrome, and the trial court finally determines, after a trial of the issue, that the illness is Guillain-Barre Syndrome, then the United States will stipulate that no theory of liability ... need be proven, and the only remaining issue on liability would be causation...."

5. See Plaintiff's Trial Brief, Document # 62, at 69–108.

Lucy married Francis McDonald, now 43, on August 12, 1972. They have no children. Francis, a carpenter and construction worker until he sustained a fall in June of 1977, is permanently disabled for social security purposes, and suffers from a progressive congenital hearing deficit which makes communication with his wife difficult.

In 1971 the Plaintiff began work in the garment industry in the shipping department of the Lee Manufacturing Company. She soon was promoted to a presser's position (the highest paid in the facility) and was described as an excellent worker and employee. She would have remained in her employment were it not for her illness.

Plaintiff's medical history was unremarkable. She has hypertension, and is insulin dependent since her diagnosis as a diabetic in 1975. Neither of these conditions interfered with her normal life or employment, nor contributed to her present condition.

## IV. THE SWINE FLU INOCULATION AND THE ONSET OF PLAINTIFF'S MALADIES

Lucy McDonald received the swine flu vaccination on November 14, 1976 at the Pittston Area High School. Because of her diabetic condition, she was administered the bivalent, rather than the monovalent, vaccine.[6] Prior to receiving this injection, Lucy was interviewed briefly by non-medical personnel and given a document entitled "Influenza Immunization Consent/Data Form"[7] to peruse and sign. A section of that document labeled "Possible Side Effects" read:

A small percentage of persons receiving this vaccine may experience one or more of the following symptoms: Redness, warmth and tenderness of the injection site, fever (usually 101 degrees or less), chills, nausea, loss of appetite, muscle aches, joint pains, headache or fatigue. These reactions are usually short-lived, lasting less than 48 hours, but local reac-

tions at the injection site may persist for more than several days. As with any vaccine or medication, the possibility of severe or potentially fatal reactions to flu vaccine must be considered. However, flu vaccine has rarely been associated with severe or fatal reactions.

After a cursory review of this form, the Plaintiff signed it and was then instructed to report to the appropriate line to receive the bivalent vaccine. While waiting in line, she was handed another document entitled "Fight Flu—Immunize",[8] which included only the following information concerning possible side effects of the vaccine:

These vaccines have been field tested and shown to produce very few side effects. Some people who receive the vaccine had fever and soreness during the first day or two after vaccination. These tests and past experience with other flu vaccines indicate that anything more severe than this would be highly unlikely.

\* \* \* \* \* \*

As indicated, some individuals will develop fever and soreness after vaccination. If you have more severe symptoms or if you have fever which lasts longer than a couple of days after vaccination, please consult your doctor or a health worker wherever you receive medical care.

During the evening of November 14, 1976, Plaintiff experienced the predicted fever along with nausea, headache, diarrhea and a general achy feeling throughout her body. These "flu-like" symptoms subsided in approximately two to three days and she enjoyed her normal good health until mid-December of 1976. On December 14 or 15, 1976, she felt some numbness in her right hand while at work. She relieved this "pins and needles" feeling by running her hand under lukewarm water for several minutes. Approximately one week later, again while at work, she experienced an "achy feeling" in her lower back. She remembers bending

---

6. The bivalent vaccine was administered principally to those inoculees over 65 and those with certain chronic illnesses to protect against both swine influenza and A/Victoria influenza.

7. Plaintiff Exhibit # 131.

8. Attached to Plaintiff's Exhibit # 131.

over her ironing board in an attempt to stretch her back muscles to alleviate the ache. On or about December 22, 1976, Plaintiff experienced numbness and a "pins and needles" sensation in her right foot which "felt like a sponge" on the sole of her foot. By Christmas day or shortly thereafter, this tingling sensation had progressed to both feet and her legs were beginning to feel "heavy" and weak. This numbness and weakness ascended to her calf and thigh area by December 27, 1976 and it was becoming increasingly difficult for her to perform the normal household tasks of cooking and cleaning. By December 30th, she was having considerable trouble getting out of bed by herself and it was necessary for her husband to assist her with this as well as to help her to the bathroom and into the shower. New Year's Eve, 1976, is the last time the Plaintiff can ever remember standing on her own. Over the course of the next few days her condition worsened and, at the direction of her family physician, she was finally admitted to Wilkes-Barre General Hospital on January 5, 1977.

Lucy McDonald remained a patient at the Wilkes-Barre General Hospital (WBGH) from January 5, 1977 until March 2, 1977. The admission history, elicited by Dr. Norina D'Ioria, Plaintiff's family physician, was as follows:

This is a 33 year old female, diabetic, who was admitted with a two week history of progressive numbness, of the legs. The numbness is described as a pickey, pins and needles feeling, starting in the toes, and working up gradually, and at the present time, is in the mid portion of the thigh. In association with this, in the past few days, there has been difficulty in ambulation and the patient has been getting around with the aid of crutches. She had her swine flu vaccine in November. There is no pain in association with this and she has had no history of back injury.[9]

The few days prior to her admission to WBGH, the Plaintiff had also experienced problems urinating.

9. WBGH Records, Plaintiff's Exhibit # 132 at 5.

During the first three weeks of her stay at WBGH, the Plaintiff underwent numerous diagnostic evaluations, including x-rays, a myelogram, a nerve conduction study, a cystometrogram, and various laboratory tests. The x-rays and myelogram were essentially normal; they indicated no significant abnormalities in the spinal or abdominal structures and no evidence of a space occupying lesion on or near the spinal cord. Nerve conduction studies done on January 8, 1977 by Dr. A. Samii, a neurologist, evidenced prolonged latencies in the left and right peroneal nerve, an absence of motor conduction in the left and right tibial nerve and a dispersion of the evoked responses in the peroneal nerve. The cystometrogram examination undertaken by Dr. Penugonda, a urologist, revealed that the Plaintiff had a "flaccid neurogenic bladder" of the "lower motor neuron" type. A spinal fluid analysis indicated a slightly elevated total protein level and an abnormally high ratio of total protein to IgG (immunoglobulin G) of 22%, the normal being approximately 10%. The day after Plaintiff's admission to WBGH the deep tendon reflexes (DTR's) in her ankles were absent and diminished at her knees. The following day, January 7, 1977, the DTR's at both knees were absent. At this time, the reflexes in the upper extremities were reported as "good" and "equally present."

The disease process which was affecting the Plaintiff's body continued its progressively deteriorating course until its peak sometime in mid-January, 1977 and, upon her transfer to Allied Services for the Handicapped, Inc. (Allied), her major physical deficits were paralysis from the waist down and dysfunction of the bowel and bladder.

She was admitted to Allied on March 2, 1977 and remained there on an in-patient basis until October 28, 1977. While at Allied she was seen on three occasions by a neurologist, Dr. Stanley Rosenblatt. The notes of one of these consultations, on March 3, 1977, indicates that the Plaintiff

had no DTR's in her upper or lower extremities. Bladder studies conducted there by various physicians reported a "reflex bladder" with "uninhibited contractions" present and also a "spastic striated muscle." On April 8, 1977, an electromyographic (EMG) study was conducted which revealed the presence of fibrillations and positive sharp waves, a sign of denervation in the peripheral nervous system. The Plaintiff also developed a sacral decubitus ulcer (bedsore) during this time but it gradually healed without the necessity of surgery. The Allied records also reported the presence of a urinary tract infection on two occasions which cleared with antibiotics. Despite some slight improvement in her condition, upon discharge from Allied, Plaintiff's primary deficits of paraplegia and bowel and bladder dysfunction persisted and, in fact, continue until this day.

Subsequent to her discharge from Allied, Plaintiff returned to her family home in Pittston, Pennsylvania with her husband, Francis. From that time until 1982, she received no significant neurological, urological or orthopedic treatment or evaluation for her medical problems. Recently, however, she has since been examined on numerous occasions by the following Plaintiff's medical witnesses: Dr. Charles Poser, three times; Dr. Peter Lichtenfeld, Dr. Robert Rhamy, Dr. H. Penugonda, twice each, and Dr. Albert Janerich, once; and on one occasion by the Defendant's medical witness, Dr. Richard Tenser. The diagnostic significance of these physicians' clinical findings will be discussed *infra;* however, before doing so, we believe that a brief description of the two disease processes involved in this action, GBS and transverse myelitis, is appropriate.

## V. GUILLAIN–BARRE SYNDROME

GBS is a neurologic disorder, inflammatory in nature, which primarily affects the peripheral nervous system.[10] It has been described as a "subacutely evolving paralytic disease of unestablished etiology." Arnason, *Inflammatory Polyradiculoneuropathies,* Ch. 56 of Dyck, et al., *Peripheral Neuropathy* at 1110 (1975). The term GBS describes not a single well-defined organic disorder, but rather a collection or constellation of neurological symptoms and findings; thus, the features which allow a positive diagnosis of GBS should include clinical, laboratory, and electrodiagnostic criteria. Asbury, *Diagnostic Considerations in Guillain-Barre Syndrome,* 9 Annals of Neurology 1 (Supp.1981). The characteristic pathologic presentation is lymphocytic cellular infiltration of the peripheral nerve and destruction of the myelin, the white, fatty substance which protects, insulates and nourishes the peripheral nerves. The resulting segmental demyelinization impairs the nerves' ability to conduct electrical impulses from the brain which control the reflexes and movement of certain muscles. GBS generally proceeds in a patchy rather than diffuse pathological manner, resulting often times in the partial rather than total denervation of the affected peripheral nerves.

In an attempt to assist physicians in recognizing the syndrome's diagnostic boundaries, an *ad hoc* committee convened by the National Institute of Neurological and Communicative Disorders and Stroke (NINCDS) formulated and published criteria in the Annals of Neurology.[11] The most prominent and the only two required features under the NINCDS criteria are (1) progressive bilateral motor weakness, and (2) areflexia (loss of tendon jerks). The severity of weakness may cover a wide spectrum from mild ataxia (failure of muscle coordination) to total paralysis of every motor and cranial nerve. In most instanc-

---

**10.** The central nervous system consists of the brain, brain stem, and the spinal cord. The peripheral nervous system begins where the nerves leave the spinal column and extends throughout the body.

**11.** See Plaintiff's Exhibits # 151, 261; Defendant's Exhibit # 31. Paragraph IV of the Final Pretrial Order of the Multidistrict Court noted that "[i]n cases in which the United States contests that the illness is in fact the Guillain-Barre Syndrome, it intends to rely upon the National Institute of Neurological and Communicative Diseases and Stroke guidelines as working criteria."

es, the weakness is first noticed in the legs and gradually ascends through the body. Rarely are there solely sensory symptoms in the absence of motor debility. Tendon reflexes are usually abolished in affected areas although a flicker of activity may remain in mild cases. *Arnason, supra* at 1121–1123.

The onset of symptoms is typically subacute. Evolution of the syndrome is complete after two weeks in over fifty percent of the cases; after three weeks in eighty percent; and after four weeks in ninety percent. In other words, the disease peaks within one month of onset in a vast majority of the episodes. A stable period of brief duration precedes the recovery phase. Satisfactory recovery occurs by the end of four to six months in eighty-five percent of the cases, although some patients show permanent deficits of varying severity. *Id.* at 1121. The criteria also lists certain clinical, laboratory and electrodiagnostic findings as "strongly supportive" of the diagnosis. The two most important clinical signs under this category are progression of the motor weakness and a relatively symmetrical evolutionary disease process. A significant number of GBS patients also show evidence of slowed nerve conduction on electrodiagnostic testing and an increase of cerebrospinal fluid protein on lumbar puncture during the acute phase of the illness. The criteria also lists six features as "casting doubt" on the diagnosis of GBS.[12]

In general, the NINCDS criteria "were by intention somewhat restrictive because they were designed for use by both neurologists and nonneurologists in case identification during field studies of GBS." *Asbury,*
*supra* at 3. They purposely define only the "core disorder" and, thus, the precise "diagnostic limits of the disorder are still uncertain." *Id.* at 1.[13]

## VI. TRANSVERSE MYELITIS

Transverse myelitis is an internal, inflammatory process which results in the production of a spinal cord lesion. Its evolution is generally acute, but may be subacute, and the presenting symptoms often consist either of diffuse tingling sensations in the lower extremities, a burning sensation in the girdle surrounding the affected spinal cord segment, or severe back pain. Plum and Olson, *Myelitis and Myelopathy,* Ch. 36 in *Clinical Neuropathy* at 26 (Baker & Baker ed. 1973). The lesion transects the spinal cord horizontally but is generally limited vertically to one or a few spinal segments. All sensation is lost below the level of the lesion and deep tendon reflexes are nearly always intact but hyperactive. Willson, *Neurology* at 226 (2d ed. 1955). It is more commonly associated with a sharp sensory level and pain and also with spasticity in the affected extremities and autonomic components, *i.e.,* the bowel, bladder and sphincter. It is generally of unknown etiology but is believed to represent an abnormal autoimmune response to an antigen such as a viral infection or vaccine. Plum and Olson, *supra* at 24, 26.

## VII. EXPERT TESTIMONY REGARDING PLAINTIFF'S ILLNESS AND CAUSATION

### A

Medical testimony was presented on behalf of the Plaintiff with respect to the

---

12. These include:
   A. Notable persistent asymmetry of weakness
   B. Persistent bladder or bowel dysfunction
   C. Bladder or bowel dysfunction at onset
   D. More than 50 mononuclear leukocytes per cubic millimeter in CSF (cerebrospinal fluid)
   E. Presence of polymorphonuclear leukocytes in CSF
   F. Sharp sensory level

13. The Pennsylvania Department of Health also published an article in Pennsylvania Medicine in April of 1978 which contained a case defini-

tion of GBS submitted by Dr. Richard Tenser, a defense witness in this case. See Plaintiff's Exhibit # 289. Pursuant to this definition, an individual was "accepted as a case of Guillain-Barre syndrome if he met the following criteria:

1. Onset develops subacutely with the full syndrome developing 1 to 7 days after the initial symptoms.
2. Marked weakness of one or both sets of extremities, always symmetrical but not always precisely equal.
3. Areflexia to marked hyporeflexia in the areas of weakness."

issues of her illness and its cause by the following expert witnesses:

> Peter Lichtenfeld, M.D., Neurologist and Assistant Professor of Neurology, State University of New York

> William H. Jeffreys, M.D., Director of Neurology Services, Geisinger Medical Center

> Robert K. Rhamy, M.D., Professor and Chairman of the Department of Urology, Vanderbilt University

> Haragopal Penugonda, M.D., Urologist, Wilkes-Barre, Pennsylvania

> Albert D. Janerich, M.D., Director of Physical Medicine and Rehabilitation, NPW Medical Center

> John J. Shane, M.D., Pathologist, Director of Clinical Laboratories, Allentown & Sacred Heart Hospital Center.

> Charles M. Poser, M.D., Professor of Neurology, Boston University

The first doctor testifying for the Plaintiff was Dr. Peter Lichtenfeld, a board-certified clinical neurologist, who has cared for approximately 75 GBS patients as the primary treating physician in his private practice. He was affected himself with GBS in 1967 and, as a result of his own affliction has become very actively interested in the GBS disease process itself, its progression and the variety of symptoms that may appear in different patients stricken with this disease. He testified that he has made a detailed study of some 28 patients with GBS for phenomena that had not been given much attention by other doctors and writers. He described GBS as a syndrome, rather than a disease, with a combination of symptoms characterized by weakness in the extremities and a loss of deep tendon reflexes, and eventual paralysis of some of the extremities. He went on to testify that many patients have involvement not only of the peripheral nerves, but also the nerve roots, the spinal cord and the brain, and

indeed, noted that the autonomic nervous system is also often affected by GBS. He has published a paper on this latter phenomenon. See Lichtenfeld, P.: *Autonomic Dysfunction in the Guillain-Barre Syndrome,* The American Journal of Medicine, Vol. 50, 772–80 (1971).

Dr. Lichtenfeld was somewhat critical of the NINCDS criteria because he believed that there was not enough set forth in the criteria to show how many variables are often found in GBS. He went on to point out that, historically speaking, there was not a great deal of familiarity with GBS prior to the swine flu program in 1976 and that GBS was often alluded to by other names.[14]

He testified that while there is often significant recovery in GBS cases, it is not unusual to find spinal cord involvement and that the amount of recovery varies greatly from case to case. The recovery is usually consonant with the amount of damage done throughout the body as a result of the initial attack on the myelin. He distinguished transverse myelitis from GBS saying that transverse myelitis is usually an attack on a very limited area of the spinal cord and usually does not affect the peripheral nervous system. He stated that GBS, on the other hand, does concern itself with the peripheral nervous system, but that it is not uncommon at all to find some manifestation in the spinal cord or the central nervous system. Indeed, he went on to testify that there is often a resultant effect on the autonomic nervous system, particularly the blood pressure in GBS patients.

He testified that while most GBS patients do not have extensive bladder and bowel problems, and that patients with TM will often have such complications, it is not uncommon or unheard of to find persistent bladder and bowel problems resulting from

14. He referred to a footnote in Dr. Arnason's chapter in Dyck, et al., *Inflammatory Polyradiculoneuropathies,* at 1110 (M.D.L. Document No. 103), in which the author observed that other common designations for this disease include idiopathic polyneuritis, acute febrile polyneuritis, infective polyneuritis, postinfectious polyneuritis, acute toxic polyneuritis, acute polyneuritis with facial diplegia, acute infectious neuronitis, polyneuronitis, mononeuronitis, radiculoneuritis, polyradiculoneuritis, Guillain-Barre-Strohl Syndrome, Landry-Guillain-Barre-Strohl Syndrome. See Plaintiff's Exh. # 218.

GBS. He noted that one of Guillain's original cases had bladder and bowel dysfunction as well as several of his own.

Dr. Lichtenfeld did examine the Plaintiff on two occasions in September and December of 1982, and also reviewed the medical records from WBGH and Allied. In his examination, he testified that he found remaining weakness in the Plaintiff's upper extremities and demonstrated the tests he performed on her. He stated that the lack of deep tendon reflexes in the lower extremities of the Plaintiff is indicative of GBS and not indicative of TM, indicating that indeed, in TM, the patient would have deep tendon reflexes which would be hyperactive. He also testified that spinal shock could not explain the loss of these DTR's since there is no evidence of this in the records.

He pointed out that in TM cases the bladder of the patient is usually spastic, whereas in the Plaintiff's case, she has a large, distended flaccid bladder which is more in keeping with the diagnosis of GBS. He testified that the Plaintiff manifests the two basic NINCDS criteria for a diagnosis of GBS, i.e., progressive motor weakness in more than one limb and loss of deep tendon reflexes, and that she has no symptoms which would rule out GBS. Further, he noted that while some of the symptoms that she has might be consistent with other diseases, nonetheless, when taken in connection with her overall clinical picture, they all lead to the inescapable conclusion of GBS.

Dr. Lichtenfeld testified that the electrodiagnostic testing performed on the Plaintiff showed that there was nerve conduction loss and that the condition in her legs got progressively worse. He stated that the results of these tests would be different if the Plaintiff had transverse myelitis, because even though there would be a central nervous system disorder in transverse myelitis, the peripheral nerves would still innervate the muscles which would show on the electrodiagnostic testing.

To the contrary in this case, he said that the electrodiagnostic test of Dr. Janerich's on May 27, 1982 shows that there was denervation in many of the Plaintiff's leg muscles and that an illness that has this phenomenon should not be referred to as TM. He said that all of these electrodiagnostic tests are consistent with GBS, since they refer to an attack on, or a problem with, the nerve roots and the peripheral nerves in the extremities. In explaining that the Plaintiff has a positive Babinski response [15] in one of her legs, he said this would not rule out GBS because while she has significant loss of the nerve and muscle fibers of the leg, there would be enough fibers remaining to allow an involuntary movement such as a Babinski response.

In referring to the records of the Allied Services Hospital, and particularly the consultation notes of Dr. Rosenblatt, Dr. Lichtenfeld noted that they show that on March 3, 1977 the Plaintiff had flaccid lower extremities and no DTR's in the upper or lower extremities and stated that these are classic GBS symptoms.[16] He pointed out that there was no further examination by Dr. Rosenblatt until March 31, 1977 and that the report at that time showed no improvement in the Plaintiff's motor functions since her admission to Allied. He stated that these findings could not result from diabetes or any lower spinal cord disease; thus, ruling out, in his opinion, any diagnosis of TM, particularly with a lesion at the T10 or T12 level of the spinal cord, as the government contends. He testified that in his examination the Plaintiff's abdominal reflexes were present, signifying that the spinal cord was functioning well at that level, which, he stated, would not be the case if the government's theory was correct. Regarding the Babinski response, he testified that in his most recent exami-

---

15. A Babinski response is an "abnormal reflex ... characterized by extension of the great toe with fanning of the other toes on sharply stroking the lateral aspect of the sole." Blakiston's, Gould Medical Dictionary (3d ed.1972).

16. See Plaintiff's Exhibit # 133.

nation he only found a reaction on the Plaintiff's right side, and noted that if there was a true spinal cord lesion suffered by the Plaintiff she should have a Babinski response on both sides. He testified that such findings as a Babinski sign and leg spasms indicate spinal cord involvement in this case, but that would definitely not rule out the diagnosis of GBS.

On cross-examination, Dr. Lichtenfeld testified that few patients of his with GBS have as much or more in the area of residuals than the Plaintiff. He said that one was about as bad and one was somewhat worse, but that most patients recover considerably better than did the Plaintiff in this case. He testified that back pain is a common feature in GBS cases, even though it usually does not continue, and agreed that it would also be a symptom in a transverse myelitis case. He testified that it is not a necessary symptom in GBS and, indeed, some GBS patients have no back pain at all in their history. Further, he testified that, in his opinion, all of the studies on her bladder showed that she has had a flaccid bladder for some time, and that this is perfectly consistent with GBS and inconsistent with TM.

On rebuttal, Dr. Lichtenfeld reiterated that spinal shock was not involved in this case and that Plaintiff's diabetic condition played no role in her present illness. He stated that Plaintiff has a flaccid paralysis with some "noticeable but mild" flexor spasms. He opined that the Plaintiff has an illness affecting the peripheral and central nervous systems simultaneously and referred to numerous articles documenting central nervous system involvement in GBS.[17] He also referred to medical articles

other than his own discussing bladder and bowel dysfunction in GBS.[18] In conclusion, he listed several clinical features present in this case which would not allow for a diagnosis of TM:

1) the electrodiagnostic testing—the early study indicates significant distal involvement at a time the disease was still evolving, which would be inconsistent with the Defendant's explanation of anterior horn cell disease, discussed *infra;*

2) absent DTR's in upper extremities in March, 1977 and their asymmetrical return; and

3) a general flaccid paralysis, including the bladder.

He opined that the Plaintiff in this instance absolutely has GBS and that her condition is the direct result of the swine flu inoculation.

Dr. Jeffreys, a board-certified neurologist, was the next physician to testify on behalf of the Plaintiff. He has been contacted previously on eight or nine occasions to review files for the government in swine flu cases. With respect to this case, he was also asked to review the records for the government to determine whether or not the Plaintiff had GBS and whether it was causally related to the swine flu inoculation she received.[19] He testified that he advised the Government that his response was affirmative to both inquiries.

At trial, Dr. Jeffreys reaffirmed his earlier conclusions and opined specifically that the Plaintiff suffers from GBS and that the cause of her disease was the swine flu vaccine. After reviewing the medical records in this case, he testified that he must rule

---

17. See Haymaker, W. and Kernahan, H.: *The Landry-Guillain-Barre' Syndrome, A Clinicopathologic Report of Fifty Fatal Cases and a Critique of the Literature,* Medicine, 28: 59–141 (1949) (Plaintiff's Exh. # 158); Baker, A.B.: *Guillain-Barre's Disease (Encephelo-Myelo-Radiculitis),* The Journal Lancet, 384–398 (Dec. 1943) (Plaintiff's Exh. # 201); Lowenberg, K.: *Polyradiculoneuritis with Albuminocytologic Dissociation,* Arch. of Neurology & Psychiatry, 53: 185–90 (1945) (Plaintiff's Exh. # 163); Lonnum, A.: *Guillain-Barre' Syndrome with Prominent Spinal and Cerebral Phenomena,* Acta Psychiat. Scandinavia, 31: 261–71 (1955) (Plaintiff's Exh. # 243).

18. See Kogan, B., et al: *Urinary Retention Secondary to Landry-Guillain-Barre's Syndrome,* Journal of Urology, 126: 643–44 (1981) (Plaintiff's Exh. # 272); Baker, A.B.: *Guillain-Barre's Disease (Encephelo-Myelo-Radiculitis), supra.*

19. See Plaintiff's Exhibit # 137.

out a diagnosis of TM. In addition to the fact that he found the Plaintiff to have the two required features under the NINCDS criteria, *i.e.,* progressive weakness and areflexia, he testified that his diagnosis of GBS as opposed to TM was based on the following clinical findings:

1) subacute evolution—he described TM as a sudden loss of function;
2) upper extremity involvement, which could not occur with a spinal cord lesion at the T10–12 level as the Government contends;
3) positive evidence of peripheral nerve involvement;
4) absent DTR's in the lower extremities;
5) the presence of abdominal reflexes;
6) the electrodiagnostic testing which showed gross peripheral nerve abnormalities inexplicable by any variant of TM; and
7) the presence of a flaccid bladder.

In sum, the witness stated that you would have to ignore the Plaintiff's disease history, its temporal onset and all the electrodiagnostic testing to conclude that the Plaintiff is suffering from TM.

Dr. Jeffreys commented that the Plaintiff does have an admixture of both peripheral and central nervous system involvement with her disease, but stated that the presence of such spinal cord features as a Babinski response and flexor spasms would definitely not rule out a diagnosis of GBS. He further testified that GBS victims can have permanent paralysis and bowel and bladder dysfunction and, in fact, he currently has one patient with such residual deficits. Finally, he noted that the flaccidity manifested by the Plaintiff could not be explained on the basis of spinal shock or her preexisting diabetic condition.

Dr. Robert Rhamy, a board-certified urologist, testified mainly as to the Plaintiff's bladder and sphincter condition and its rela-

tionship to the diagnosis and cause of her illness. In his practice he has treated 30–35 GBS patients with urological problems.

Regarding the permanency of the Plaintiff's bowel and bladder dysfunction, Dr. Rhamy testified that he has treated four other GBS patients with persistent urological symptoms. He also referred to three medical articles which document cases of GBS patients with permanent bowel and bladder dysfunction.[20]

In August of 1982, Dr. Rhamy performed urodynamic studies on the Plaintiff. He testified that a spastic bladder, one which has a small capacity and increased tone, is characteristic of a spinal cord lesion or TM, while a flaccid bladder, one with a large volume and decreased muscle tone, is classically evidence of peripheral nerve damage or GBS. He unequivocally stated that all the urological testings, those from WBGH, Allied and his own, show the Plaintiff to have a large, flaccid bladder. He noted the Plaintiff does have a spastic sphincter, which is indicative of spinal cord involvement, but opined that the present disorder is "predominantly" the result of peripheral nerve damage. He ruled out diabetes as a causative factor of the bladder dysfunction.

Dr. Rhamy testified that involvement of the central nervous system does not rule out a diagnosis of GBS and referred to numerous medical articles documenting the combination of peripheral and central nervous system findings in GBS patients.[21]

He was of the opinion that the Plaintiff has GBS which was caused by the swine flu vaccine.

Dr. Penugonda, a board-certified urologist, identified his reports, and by stipulation of counsel was permitted to submit these reports in lieu of his testimony. He performed urological evaluations of the Plaintiff in January, 1977 at WBGH and again recently in October, 1982. His find-

**20.** See footnote 18, *supra;* Poser, C. *Criteria for the Diagnosis of the Guillain-Barre' Syndrome, A Critique of the NINCDS Guidelines,* Journal of the Neurological Sciences, 52: 191–99 (1981) (Plaintiff's Exhibit # 152).

**21.** See footnote 17, *supra;* and Matsuyama and Haymaker, *Distribution of Lesions in the Landry-Guillain-Barre' Syndrome,* Acta Neuropathologica, 230–241 (1967) (Plaintiff's Exhibit # 160).

ings were consistent with Dr. Rhamy's, *i.e.,* the Plaintiff has a flaccid bladder and a spastic sphincter, indicating dual involvement of the peripheral and central nervous systems in the Plaintiff's disease process.[22]

Dr. Albert Janerich was the next physician to testify on behalf of the Plaintiff. He is board-certified in physical medicine and rehabilitation and specializes in electrodiagnostic testing, *i.e.,* nerve conduction studies and electromyography (EMG).

In May of 1982, he performed nerve conduction studies and an EMG on the Plaintiff. The former test is used to assess the integrity of the nerves to conduct impulses and an EMG studies the activity of the innervated muscles. In referring to the earlier nerve conduction tests of Dr. Samii, recorded in January of 1977 at WBGH, he said that the tests showed abnormality of the nerves in both legs, in the peroneal nerve and in the tibial nerve. He showed that there was affectation of the peripheral nervous system bilaterally in the lower extremities and for such a finding to occur, an upper motor neuron lesion, such as TM, would not be involved. By reference to the progress notes of an EMG performed at Allied Services in 1977, he demonstrated that no volitional motion was in existence at that point and that several nerves were totally denervated, indicating a lower motor neuron disease. He stated that these findings could not result from a spinal cord lesion at T–10 or T–12 area of the spinal cord, as the government contends.

Dr. Janerich testified that his May, 1982 study revealed that all the nerves tested were abnormal and all the muscles tested showed either total or partial denervation.

Dr. Janerich also reviewed the records in this case and examined the Plaintiff on one occasion. He concluded that GBS was a proper diagnosis in this case because of his electrodiagnostic evaluation along with such clinical findings as the absence of DTR's in the knees and ankles, the temporal evolution of the disease, and the involvement of all four extremities. While he

noted that some of the records indicated atypical signs such as the Babinski response, the spastic sphincter and a sharp sensory level, he was of the opinion that such spinal cord symptoms would not rule out GBS.

His conclusion was that the tests were consistent with a peripheral polyradiculoneuropathy, the prototype being GBS, most likely caused by the flu vaccine.

Dr. John Shane, a board-certified clinical pathologist, testified initially about his findings in post-mortem examinations of four GBS patients. These autopsies revealed varying degrees of spinal cord involvement in each case. After reviewing the records in this case, he was of the opinion that both the laboratory and clinical findings were classic GBS indicators and without a doubt it was caused by the swine flu vaccine. Dr. Shane was also familiar with the numerous medical articles previously referred to which document cases of GBS with spinal cord involvement. He had also seen several GBS cases with a sharp sensory level in the patient.

He commented that it is perfectly logical to have bladder or bowel dysfunction in a GBS case because these functions are controlled by the autonomic nervous system and these nerves can also be demyelinated. Involvement then of the bladder and bowel, or involvement of the central nervous system, in his view, does not militate against a GBS diagnosis. In some of the four cases in which GBS was pathologically agreed upon as the cause of death, the autonomic system was involved. In at least one there was bladder and bowel dysfunction which continued up until the time of death and there was a positive Babinski response in some. The extent and location of the disease in the spinal cord differed with each patient.

Dr. Shane testified that he could not seriously consider a diagnosis of TM in this case. His opinion of GBS was based on the fact that: (1) the disease was progressive; (2) there was symmetrical weakness in the

**22.** See Plaintiff's Exhibit # 156(b).

extremities; (3) there was a period of hyporeflexia followed by areflexia; (4) the upper extremities were involved; (5) the laboratory findings showed an increased IgG ratio; and (6) the nerve conduction studies indicated demyelinization. He noted that this final factor was most significant because a proper diagnosis could not be made without consideration of electrodiagnostic testing. Dr. Shane also opined that the Plaintiff's diabetes was absolutely irrelevant to her present illness. On the issue of causation, he stated that the temporal progression of her disease over a four to five week period was perfectly consistent with its origin being the swine flu vaccine. Moreover, since there was no other preceding event or illness which could explain the onset of the Plaintiff's GBS, he was of the opinion that by the process of exclusion, an accepted medical practice, it could reasonably be concluded that the vaccine was the cause.

Dr. Shane has also autopsied numerous patients with TM and he stated that in none of these has the disease process been longitudinally broad.

He stated he was familiar with the NINCDS criteria but would quarrel with its position that spinal cord involvement in GBS is "controversial". He believes that spinal cord involvement in GBS is much more prominent than was earlier thought and that pathological studies are now confirming this. He referred to an exhibit listing numerous papers in the medical literature in which cases of spinal cord involvement in GBS patients are documented. See Plaintiff's Exhibit # 294.[23] Upon questioning by the Court, Dr. Shane stated that not all nerve innervation is destroyed by GBS and, thus, you can have some partial function of the nerves that can elicit spasticity, i.e., a flexor spasm or withdrawal response, in an otherwise flaccid paralysis. In conclusion, he maintained, as did the other Plaintiff's experts, that many clinical findings of this patient would have to be ignored to reach a conclusion of TM in this case.

Dr. Charles Poser, a board-certified neurologist, was the final medical witness for the Plaintiff. He has an impressive background in medical service, teaching and writing, having published 178 articles and written several chapters for textbooks currently used in medical schools.

This witness, like the other Plaintiff's experts, also referred to various articles documenting clinically and pathologically the involvement of the central nervous system in GBS.[24] Moreover, in his own clinical

---

**23.** This exhibit, depicting an enlarged cross section of the spinal cord at the thoracic level, listed over one hundred papers in the medical literature pathologically documenting spinal cord involvement in GBS.

**24.** In his own paper critiquing the NINCDS guidelines, Dr. Poser wrote:
Central nervous system involvement and the degree to which it may occur and still allow for retaining the diagnosis of GBS continues to be controversial. Many authors have described clearcut central nervous system involvement in their cases .... There has been ample demonstration of variable degrees of involvement of both central and peripheral nervous system after infections and vaccinations as well as in the experimentally induced disease .... The peripheral nervous system involvement may be completely masked clinically by brain, cerebellar or spinal cord lesions and detectable only by electrodiagnostic studies ...
The state of the reflexes, the presence and persistence of bladder and bowel problems, even the presence of a distinct sensory level may reflect the existence of superimposed encephalitic or myelitic lesions. That such dissemination of lesions throughout the nervous system has been recognized as occurring when the clinical presentation is most suggestive of GBS led Baker (1943) to classify the syndrome into 5 clinical forms: abortive or mononeuritic, polyneuritic, myelitic, bulbar and cerebral. There is no evidence to suggest that swine flu vaccination would give rise to a "pure" GBS syndrome when other vaccinations, including those against influenza, result in a spectrum of illness ranging from encephalopathies to mononeuropathies.... In fact, the well documented complications of the 1976 swine flu vaccination program demonstrated this same anatomical variability ....
That the spinal cord may become involved was clearly recognized by Arnason (1975) when he stated that commonly encountered designations for inflammatory polyradiculoneuropathy in the English and American literature include, among many other terms, myeloradiculoneuritis and myeloradiculitis. There seems to be little doubt that incorrect nomenclatural distinctions persist despite abundant neuropatho-

practice, in which he has treated 300 to 400 GBS patients, central nervous system involvement has also been apparent.

Cross-examination was designed to bring out the fact that the witness has been involved in a number of GBS litigation matters, and that perhaps he might be considered in a minority position, particularly in reference to his strong feelings that there can be central nervous system involvement in GBS. In this regard, he stated that he believes he is in a group that believes GBS includes a large variety of problems with the same pathogenesis, and that you cannot neatly pigeonhole the syndrome known as GBS. He went on then to explain particularly the differences between TM and GBS symptomatically. He said that TM is a form of inflammation of the spinal cord which results in a paralysis which is usually spastic, while in GBS it is usually flaccid. He said he does not use TM as a synonym for GBS. TM, in his opinion, cannot generally have peripheral nerve involvement. He indicated that he does not necessarily include bowel and bladder involvement in his normal description of GBS, but these things can occur. He referred to Dr. Lichtenfeld's paper on autonomic involvement in GBS as a major article, well-documented and well-received in the medical profession. He was of the opinion that the NINCDS criteria should not be used mechanically in all cases because they were designed only to provide a "solid core" of characteristics; rather it is imperative to consider the patient's history and other clinical findings in order to make a proper diagnosis.

Dr. Poser reviewed the medical records in this case and examined the Plaintiff on three occasions. He noted first that she does have the two required NINCDS features. He opined that the Plaintiff has GBS caused by the swine flu vaccine which has resulted in total and permanent disability. This opinion was based, in essence, on many of the same findings previously referred to by the Plaintiff's other medical witnesses, i.e., the electrodiagnostic tests, the absent DTR's in the lower extremities, the flaccid bladder, the involvement of the upper extremities, the laboratory testing of the cerebrospinal fluid, and a general flaccid paralysis. He referred to this as a classic GBS case in its evolution and symptoms but unusual in its outcome.

Dr. Poser further commented that the Plaintiff's neurological disorder was not related to her diabetic condition nor did he find any evidence of spinal shock in the medical records. He testified that even the presence of a Babinski response was inconsistent with TM because there were not bilateral signs. In response to a final question from the Court, Dr. Poser stated that specifically the Plaintiff's neurological disorder can be considered a myeloradiculoneuropathy, a term, he pointed out, which is generally accepted as being synonymous with GBS.

## B

The following medical expert witnesses testified on behalf of the Defendant in this case regarding the issues of the Plaintiff's illness and its cause:

Richard Tenser, M.D., Chief of Staff of Neurology, Hershey Medical Center

Stanley Rosenblatt, M.D., Neurologist, Scranton, Pennsylvania

Oscar Reinmuth, M.D., Professor and Chairman of the Department of Neurology, University of Pittsburgh

Gerald Winkler, M.D., Associate Neurologist, Massachusetts General Hospital and Assistant Professor of Neurology, Harvard Medical School

Dr. Richard Tenser, a board-certified neurologist, was the only defense expert to personally examine the Plaintiff. As previously noted, he provided the case definition for the Pennsylvania Department of Health's criteria for GBS, published in Pennsylvania Medicine in April of 1978.[25]

logical and experimental evidence for anatomic variability.
Journal of Neurological Sciences, Vol. 52 at 193–94 (citations omitted).

25. See footnote 13, *supra.*

He described TM as a transection of the cord, etiology unknown but thought to have an immunological basis. He stated that initially with TM there may be some spinal cord shock and that spasticity is a hallmark of TM. Symptoms of TM often vary with how much of the cord is involved or destroyed. He says that, in contrast, GBS patients have peripheral nerve system involvement and that GBS patients are unlikely to have long term bowel and bladder involvement, but it is possible. In TM, he noted that the lower motor neuron can be destroyed and the peripheral nerves all the way out to the muscles therefore, may die. This is a significant observation in the doctor's opinion, since it makes it difficult and perhaps, he says, almost impossible to decide whether the peripheral nerve damage or the injury to the spinal cord came first in a case such as the Plaintiff's.

Regarding his physical examination in October, 1982, he stated that from the umbilicus upward he found the patient normal, at about the T-12 spinal cord level there was loss of sensation to pin prick, weakness in both legs, small leg movement, absent deep tendon reflexes in both legs, and some flexor spasms upon stimulation of the foot. He said a reflex action indicates central nervous system involvement and that she had very prominent flexor spasms, including a knee jerk of about 90 degrees. He also found a right Babinski response and it was doubtful whether there was a left one.

With respect to the EMG testing, he said the initial one was not very helpful, and while the second, Dr. Janerich's, showed poor conduction velocity and clear evidence of denervation, it did not help in showing where the impairment was. He did admit that if there were absent DTR's in the upper extremities it would lead more to a GBS diagnosis. Regarding the cystometrograms, he said they seemed to show, at first, a flaccid and then later a spastic and then finally a flaccid, bladder. He indicated, however, that some of the readings were hard to understand. Dr. Tenser stated that if the peripheral nerves to the bladder are involved the bladder is flaccid, whereas in a spinal cord lesion the bladder is spastic. He testified that perhaps infection could cause the bladder to become flaccid. He said his reactions might be different if the bladder tests were always shown to be flaccid, as Dr. Rhamy, an expert urologist, had previously testified. He believed the development of the symptoms were slightly more toward a TM diagnosis, than a GBS. He cites the pain history of the Plaintiff, her sensory level, her bowel and bladder involvement being marked and prolonged, the Babinski sign and the flexor spasms that he observed. He also said that he considered the lack of any problem above the sensory level on the stomach, meaning no involvement in the upper extremities; however, as noted, the Plaintiff's experts opined that the Plaintiff amply demonstrated such involvement. He said that while he found her legs were flaccid regarding voluntary movement and deep tendon reflexes were absent, there were flexor spasms and a Babinski sign. He said many diabetics have diabetic neuropathy, but did not posit this as a cause of her problem. He commented that it may count in a minor way for some of the symptoms. In his opinion, he testified that the Plaintiff had a severe spinal cord lesion, and there was no connection between the swine flu inoculation she received and the results she demonstrated.

He noted that Plaintiff's flaccid bladder could be the result of some "psychic inhibition" but the Court finds this not to be a credible explanation in view of the consistency of these studies over a five year period. Dr. Tenser also noted that the Plaintiff probably did not have spinal shock at the time of her hospitalization.

On the issue of upper extremity involvement, the witness stated that the notation at Allied of lack of DTR's in the upper extremities was an unusual finding and should have been pursued since it is more indicative of GBS. He testified that he did check the Plaintiff's upper extremities and said he believes he did test each muscle but has no recordings of any findings. His report on the upper deep tendon reflexes were gradings of trace to 1 +; he lists 2 as average and 4 as brisk, but posited that a

reading of 1, 2 or 3 is normal. All of the Plaintiff's experts as well as Drs. Rosenblatt and Reinmuth, however, testified that this reading of trace to 1+ would indicate an abnormality.

Dr. Tenser testified that the Plaintiff did not have abdominal reflexes in the lower two quadrants. He stated that he never saw a case of TM progress over a week but noted that some are reported, and that this type of lengthy progression is not uncommon in GBS. He said he felt the spinal cord damage was clear in this case, but he could not be sure about peripheral nerve damage because the myelin in the peripheral nerve can die from central nerve disease.

In response to questions by the Court, the witness indicated that because, in his opinion, the spinal cord was so involved here that all nerves below that area of the cord damage have degenerated and, thus, it is not possible to determine whether there is true peripheral nerve involvement or whether the nerves have simply died as a result of the cord damage. Finally, Dr. Tenser stated that he believes the diagnosis in this case was a "close call."

Dr. Stanley Rosenblatt, a board-certified neurologist, testified he had evaluated and examined the Plaintiff at Allied in 1977, but did not recommend any treatment or confer at any time with her treating physician. Initially, he considered GBS as a possible diagnosis because of the proximity of the Plaintiff's symptoms to the swine flu inoculation, but he felt his examinations and review of the records excluded it, primarily because of the evidence of spinal cord involvement. In reaching a diagnosis of TM, he did state that he could not explain the initial nerve conduction tests but he believed the Plaintiff's diabetic condition could account for these as well as some of the findings on the early EMG tests. In Dr. Rosenblatt's opinion, the Plaintiff had too many variants for a diagnosis of GBS; specifically, he mentioned: (1) the complete paralysis of the lower extremities without apparent involvement of the upper extremities; (2) sensory findings; (3) the lack of recovery; and (4) the prolonged and permanent involvement of the sphincter and bladder.

On cross-examination, he testified that he could not say there was not spinal shock in this case, however, he could not point to anything in the medical records as a foundation for such a finding. He agreed that his March, 1977 finding at Allied of no DTR's in the upper extremities would indicate a peripheral nerve problem. He admitted that if there was a weakness in the upper extremities early on and then an asymmetrical return of strength, as the Plaintiff's experts have described in this case, this would be more consistent with GBS. He testified that Dr. Tenser's finding of a trace to 1+ reading in Plaintiff's upper DTR's is abnormally low and that an asymmetrical recovery of the DTR's is more consistent with GBS than a diabetic neuropathy. He admitted he was at a disadvantage in not having a recent personal examination of the Plaintiff.

Regarding the temporal evolution of the disease process, Dr. Rosenblatt admitted that a one-month period would be more consistent with GBS and that he had not seen any TM cases which took up to 30 days to evolve. The witness was not familiar with any of the over one hundred papers listed on the Plaintiff's Exhibit # 294, which document pathological findings of spinal cord involvement in GBS. He was also not familiar with articles disclosing sensory findings in GBS. He stated that he was aware of the NINCDS criteria and the Pennsylvania Department of Health's GBS criteria and agreed that the Plaintiff's condition would satisfy the required features under these standards. He felt, however, that the Plaintiff had too many variants under the NINCDS criteria to conclude a diagnosis of GBS.

On the issue of spinal cord involvement in GBS, he noted that there may be minor symptoms of such, but he was of the opinion that the spinal cord involvement was "too much" in this case. In response to a question from the Court, the witness stated that he adheres to a "rather rigid interpretation separating cord involvement from

peripheral involvement" in considering a diagnosis of GBS.

Dr. Oscar Reinmuth, board-certified in internal medicine and neurology, also testified that, in his opinion, the Plaintiff's illness was an acute TM unrelated to the swine flu vaccine. The significant findings in the records he reviewed that led him to conclude this were: (1) the early and severe bowel and bladder dysfunction; (2) the sensory loss below T–12 level and no apparent effect above that level; (3) the extensor plantar response and the spasms of the legs; and (4) the presence of four polymorphonuclear cells in the Plaintiff's cerebrospinal fluid. He testified that the EMG tests were not that helpful in his diagnostic evaluation of the case. He also noted that the Plaintiff's bladder may be remaining flaccid because it became overdistended for awhile and cannot regain its muscle tone. He espoused a theory similar to that of Dr. Tenser on the issue of involvement of the peripheral nerves. He testified that segmental demyelinization of the peripheral nerves can occur as a result of a primary spinal cord lesion which causes the anterior horn cells within the spinal column to become diseased and, in turn, causes the peripheral nerves that exit from the anterior horn cells to degenerate.

On cross-examination, Dr. Reinmuth agreed that there was no evidence of any pre-existing illness or disease which could have caused the Plaintiff's present disorder. In addition to his previous testimony concerning the fact that there may be a spinal cord lesion which causes secondary degeneration in the peripheral nerves, the witness also acknowledged that there may be a primary peripheral lesion, or GBS, which "dies back" and affects the anterior horn cell within the spinal cord. Thus, in his mind the central question in the case was where the disease process began, in the spinal cord or in the peripheral nerves. He noted that with a primary spinal cord disease the axon of the nerve is usually destroyed first and then demyelinization occurs. In referring to the January, 1977 nerve conduction studies, he agreed, however, that if they were correct they indicated that the myelin was being affected very early in the evolution of the disease process.

He testified that a flexor spasm signifies "profound spinal cord disease" and this alone, in his opinion, is enough to make this a non-GBS case.

This witness testified that he did prepare a report, dated September 2, 1982, which was never forwarded to the government, in which he concluded, inter alia, that "the swine flu vaccination is the probable responsible cause of the neurologic disorder that she [the Plaintiff] suffered...."[26] He contends, however, that he changed his mind on causation between that date and his November 3, 1982 report, which was forwarded to the government and is a part of the record.[27] He testified that he did so on the basis of his review of two medical studies on TM.[28] He acknowledged that the study by Dr. Kurland involved TM cases in which the disease had set in acutely, between 24 and 96 hours, quite distinct from the evolution process in this case, but he did not agree that because of this discrepancy the study was not helpful in his diagnosing of the Plaintiff's disorder. He was not familiar with an article written by Dr. Bruce Schoenberg, in which the author commented upon the relatively small sample group used in the Kurland study and concluded that it may be "dangerous to regard the inhabitants of these two regions as representative of the entire United States."[29]

**26.** Plaintiff's Exhibit # 292 at 1.

**27.** Defendant's Exhibit # 154; Plaintiff's Exhibit # 293.

**28.** See Kurland, et al., *Incidence of Acute Transverse Myelitis in Rochester, Minnesota, 1970–1980, and Implications with Respect to* *Influenza Vaccine,* (Defendant's Exh. # 96); Fenichel, *Neurological Complications of Immunization,* (Defendant's Exh. # 97).

**29.** Schoenberg, B., *Epidemiology of Guillain-Barre' Syndrome, Advances in Neurology,* 19: 249 at 253 (1978) (Plaintiff's Exh. # 344).

Finally, the witness agreed that the three required features for a GBS diagnosis under the Pennsylvania Department of Health's criteria were present in the Plaintiff's case.

Dr. Gerald Winkler, a board-certified neurologist, was the final medical witness to appear on behalf of the Defendant. He reviewed the medical records in this case and opined that the Plaintiff has TM of unknown etiology.

Generally, in outlining why he thought the Plaintiff's main problem was in the spinal cord region, he stated that he found that stimulation to the foot prompted reflexes in the legs and interpreted this as meaning that the peripheral nerve circuit was functioning. However, the Plaintiff's inability to produce this response voluntarily meant, to him, that the interruption must be in the spinal cord above that section which executed the reflex action. As other defense experts testified, he noted that this spinal cord disease process will have a concomitant effect on the peripheral nerves.

Dr. Winkler testified that the major characteristic in this case is the presence of flexor spasms or contractions. He stated that, in his opinion, such signs of spasticity are hallmarks of central nervous system disease and persuasively rule out a diagnosis of a peripheral nerve disorder. He also commented that persistent bladder and bowel dysfunction and the presence of a sensory level would be incompatible with a diagnosis of GBS.

On cross-examination, the witness stated that the present flaccidity of the bladder may be due to overdistention at some point and its inability to return to its normal tone. He did agree, however, that the Plaintiff's present illness could not be attributed solely to her pre-existing diabetic condition. He also was the only medical witness in this case to indicate that there was spinal shock initially which lasted until some evidence of spasticity appeared. As noted, no reference of this is present in any of the medical records.

Dr. Winkler stated categorically that "anytime you have spasticity, you cannot have GBS." He was not familiar with many of the articles listed on Plaintiff's Exhibit # 294 which document pathologically the involvement of the spinal cord in GBS, but insisted that, in any event, such involvement would have to be secondary, through the "dying back" phenomenon. He also could not comment on Dr. Shane's actual autopsy findings in GBS patients demonstrating such involvement.

He acknowledged that electrodiagnostic testing is listed among the features of the NINCDS criteria, and that the initial tests did not comport with spinal cord disease.[30] He believed, however, that such tests were inconclusive. Regarding Dr. Rosenblatt's March, 1977 notation at Allied of absent DTR's in the Plaintiff's upper and lower extremities, he was convinced that this finding must be erroneous, since upper extremity involvement such as this would cast serious doubt upon a diagnosis of TM. Dr. Rosenblatt, however, never indicated in his testimony that this finding was erroneous.

Finally, the witness stated that as compared to other board-certified neurologists, he is not an expert on GBS.

C

■ There is no dispute in this case that the Plaintiff has suffered a tragic and disastrous impact as the result of some neurological disorder. There is no doubt that she

---

**30.** See Plaintiff's Exhibit # 134(k), an enlargement of a chart extracted from a textbook entitled Youmans, *Neurological Surgery,* at 663–64 (2d ed.1982), which indicates that with an upper motor neuron lesion, such as TM, or an anterior horn cell disease, the nerve conduction velocities and distal latencies are generally normal. Such velocities and latencies were prolonged here which comports with the peripheral neuropathy category of the chart. The electro-diagnostic picture in this case also conforms with Dr. Asbury's observations that a diagnosis of GBS "rests upon pattern recognition of the clinical picture plus other features including... electro-physiological changes of marked slowing of conduction velocities, prolonged distal latencies, dispersion of the evoked responses, and frequent evidence of conduction block." Asbury, *Diagnostic Considerations in Guillain-Barre' Syndrome, supra* at 1.

was a healthy individual, with the exception of some insignificant problems, prior to her inoculation with the swine flu vaccine in November of 1976. It is undisputed that the disease that now affects her set in approximately thirty days after the inoculation and that within a few months she was totally paralyzed from the waist down. There is no doubt either that her condition has continued to worsen since that time and today she is permanently and totally disabled, paralyzed from the waist down and with absolutely no control over the functions of her bladder and her bowel.

All of the medical witnesses confirmed that it has been medically determined that the swine flu vaccine can cause Guillain-Barre Syndrome. It is also clear that the Plaintiff has many of the symptoms which the experts in this case agree are indicative of the Guillain-Barre Syndrome. There is no doubt either that the Plaintiff has some symptoms which might lead to a diagnosis of transverse myelitis. There is less agreement on whether or not transverse myelitis is caused or can be caused by the swine flu vaccine. There is also a dispute in this case, if one were to agree that the patient's condition is transverse myelitis, that her specific transverse myelitis was caused by the swine flu vaccine. The significant dispute in this case, then, is the diagnosis of the Plaintiff's condition.

All of the doctors who testified are aware of the criteria published by the NINCDS, which were designed to facilitate the diagnosis in patients where GBS was suspected, and which were developed after problems began to develop subsequent to the swine flu immunization process attempted by the Government in 1976. There are only two features of the NINCDS criteria that are absolutely required for a diagnosis of GBS, i.e., progressive motor weakness and areflexia, and it is undisputed that the Plaintiff exemplified those two features. The other features listed in the criteria, numbering approximately 30 or 31, are items that are sometimes found or items that are never found or items that are controversial as to their existence in GBS patients. All of the medical witnesses also agreed that the three

diagnostic features listed in the Pennsylvania Department of Health's GBS criteria are present in the Plaintiff's case.

The main issue in this case is the involvement of the Plaintiff's central nervous system and what it means as to the diagnosis of her illness. The NINCDS criteria lists central nervous system involvement among one of the variants in the features to be looked for in trying to diagnose GBS. Under this heading, the criteria goes on to explain:

"Ordinarily the Guillain-Barre Syndrome is thought of as a disease of the peripheral nervous system. Evidence of central nervous system involvement is controversial. In occasional patients, such findings as severe ataxia, interpretable as cerebral in origin, dysarethria, extensor plantar responses, and ill-defined sensory levels are demonstrable, and these need not exclude the diagnosis if other features are typical."

In this case we have seen a sharp dispute among the expert medical witnesses as to whether or not the involvement of the central nervous system in this Plaintiff should rule out the diagnosis of GBS. The defense experts indicated that their diagnosis was transverse myelitis; that the proper diagnosis was not GBS; and that the immunization was not the causative factor of the Plaintiff's illness. They base their conclusions most firmly on what they say is evidence that there is involvement of the Plaintiff's central nervous system, and that, therefore, the symptoms which she displays are a result of a spinal cord lesion. At least some of the defense medical testimony is to the effect that where there is such a demonstrable involvement of the spinal cord, it is impossible to determine whether or not there is any primary peripheral nerve involvement. Without such peripheral nerve involvement, of course, the disease process could not be termed GBS. It is their conclusion that the difficulty with the peripheral nerves in the Plaintiff has resulted from the dying of the neurons within the spinal cord and the resultant degeneration

of the peripheral nerves out into the extremities.

Contrasted to this testimony, Plaintiff's experts all state that it would be absolutely erroneous to rule out the diagnosis of GBS in this Plaintiff because of the involvement of the central nervous system. They describe her case as a classic GBS case, with not only the two major features of the NINCDS criteria, but many of the other features which lead to the conclusion of GBS. They unequivocally subscribe to the theory that involvement of the central nervous system should not rule out a diagnosis of GBS in such a case. The Plaintiff's experts further testified that as there is more medical knowledge accrued concerning GBS, it is becoming increasingly apparent that it is not uncommon to have central nervous system involvement in a GBS case. Perhaps most dramatic of the testimony in this area was that of Dr. Shane, the pathologist. As noted, he testified that he has in fact examined spinal columns removed from documented GBS patients, and in a number of these cases has positively pathologically shown that GBS had indeed affected the patients within their spinal column.

The medical witnesses for the Plaintiff have impressive credentials and have not only treated numerous GBS patients and written widely on the subject, but indeed, one of the medical witnesses, Dr. Lichtenfeld, has also been afflicted with the GBS syndrome and as a result of his own affliction, has become deeply involved in the study of the syndrome and its many symptoms. They were firm in their opinions that GBS can affect and include the central nervous system, and because this Plaintiff

has so many of the symptoms normally associated with GBS, that it would be highly inappropriate to rule out that diagnosis simply because of the presence of central nervous system features.

On the other hand, the defense medical experts vacilated somewhat, including one doctor, Dr. Reinmuth, who changed his opinion as to causation after he had been supplied by the Government with a study by Dr. Kurland of a small number of TM patients in one area of the United States,[31] a study which most of the other doctors testified would be of questionable relevance to this case because of the different criteria used in selecting the patients used in the study.

Most importantly, however, several of the experts indicated that they would have to ignore some of what the Court finds were the more pertinent symptoms of the Plaintiff in order to diagnose her case as TM, including such findings as the flaccidity in her lower extremities, the flaccidity in her bladder, the electrodiagnostic testing, the involvement of the upper extremities, and the temporal evolution of the disease process. In other words, to rely on or to credit the testimony of the defense medical experts, one would have to ignore many of the symptoms which abound in the Plaintiff's disease-racked body. On the other hand, this Plaintiff has produced in Court an overwhelming volume of credible evidence from witnesses with impeccable credentials, that she does indeed have GBS and that it is a direct result of the vaccine which she received as part of the government's immunization program in 1976.[32]

31. See footnote 28, *supra.*

32. In addition to the credible expert testimony adduced by the Plaintiff demonstrating a causal connection between her illness and the swine flu vaccine, the Court also notes that the four to five week onset period in this case is well within the ten week temporal relationship period established by the principal epidemiological study on this subject. Schoenberg, et al., *Guillain-Barre Syndrome Following Vaccination in the National Influenza Immunization Program, United States, 1976–77,* American Journal of Epidemiology, Vol. 110, 105–123 (1979). During his multidistrict deposition, Dr. Schoenberg

established the following percentage chances of causation:

| Week after vaccination | Percent chance that GBS was caused by vaccination |
|---|---|
| 1 | 79.0 |
| 2 | 92.2 |
| 3 | 93.5 |
| 4 | 82.0 |
| 5 | 75.6 |
| 6 | 52.0 |
| 7 | 61.5 – 75.0 |
| 8 | 56.5 – 57.0 |
| 9 | 48.7 – 49.0 |
| 10 | 46.5 |
| 11 | No relation because increased risk disappears |
| 12 | |

A basic duty of the fact finder is to determine the credibility of the testimony, and the weight to be given to all of the evidence in the case. *Kerns v. Consolidated Rail Corp.,* 90 F.R.D. 134, 140 (E.D.Pa.), *aff'd,* 673 F.2d 1300 (3d Cir.1981); *Kerry Coal Co. v. United Mine Workers,* 488 F.Supp. 1080, 1095 (W.D.Pa.1980), *aff'd,* 637 F.2d 957 (3d Cir.), *cert. denied,* 454 U.S. 823, 102 S.Ct. 109, 70 L.Ed.2d 95 (1981). This task is not made easier when, as here, all of the expert witnesses have such distinguished and recognized reputations. Without intending to disparage any witness, we do specifically find, however, that the testimony and evidence of the Plaintiff's experts is more credible, more weighty and more believable than that of the defense. As pointed out before, there are too many holes in the defense medical testimony, too many symptoms ignored, too many findings thought to be erroneous, and too much weight given to a single factor (spinal cord involvement) to overcome the strong and positive testimony of the Plaintiff's witnesses.

Plaintiff's medical witnesses have impeccable training, have researched and written extensively and have significant clinical backgrounds in the neurological, pathological and urological fields of medicine. Their testimony was clear, impelling, and well-documented, and their conclusions comported with reason and common sense.

The Plaintiff's duty in this case is not to prove her contention beyond a reasonable doubt, nor is it her burden to prove every opinion contrary to those of her own experts. Her burden is to prove her case by the fair weight and preponderance of the evidence. *Hamil v. Bashline,* 481 Pa. 256, 264–66, 392 A.2d 1280 (1978). A reasonable reading of the evidence and the testimony in this case reveals that she has done that beyond question and that she is entitled to recover damages for her condition.[33]

## VIII. DAMAGES

### A. Amendment of the Administrative Claim

■ On November 1, 1978, the Plaintiff, through counsel,[34] timely filed her administrative claim, Standard Form 95, with the Director, Division of Public Health Services Claims pursuant to 28 U.S.C. § 2675(a). She requested damages from the United States in the amount of one million dollars ($1,000,000). The Defendant denied the administrative claim on March 31, 1980 and the instant action was thereafter filed. The Plaintiff seeks to recover damages in excess of the amount claimed at the administrative level.[35]

Under the Federal Tort Claims Act, a claimant is limited in the recovery at trial to the amount he or she claimed administratively unless "the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b).

For an extensive discussion of Dr. Schoenberg's study, see *Alvarez v. United States,* 495 F.Supp. 1188, 1203–1205 (D.Colo.1980).

**33.** We have reviewed the additional cases lately submitted by the government from various districts of the federal system. None resembles ours closely enough to be helpful—as Judge Waters pointed out in *Smith v. United States,* Civ. No. 79-5092 at 14 (W.D.Ark. Sept. 30, 1982):

> Although there is certainly no dearth of reported GBS litigation, because the state of the art is not sufficient for authorities to set forth "black letter" definitions and diagnostic indications, and because each instance of its occurrence is so individualized and particularized, the Court feels that lengthy review of

the numerous decisions would shed little light on the issues at hand.

**34.** Plaintiff retained counsel approximately two to three months before the filing of the administrative claim.

**35.** A formal motion for leave to amend the complaint to reflect these excess damages was filed by Plaintiff on July 7, 1982 (Doc. # 15). The Court advised the parties that it would take this motion under advisement and defer a ruling until after it had an opportunity to hear the medical testimony presented at trial. The parties have also each filed initial and supplemental briefs in regards to this motion.

958

In support of the Plaintiff's contention that this case fits within either or both of the above-cited exceptions, it is first argued that "[a]t the time of the filing of her Administrative Claim, the full extent of the Plaintiff's illness and disability and her corresponding need for treatment was not known and could not have been determined...." [36] On the issue of the Plaintiff's future needs, the uncontradicted testimony of Dr. Lichtenfeld established that the nature of Lucy McDonald's illness was such that the extent of her disability and the need for future care and treatment could not be predicted in 1977 or 1978. Consistent with this was the testimony of Dr. Poser who stated that only after the May, 1982 electrodiagnostic testing of Dr. Janerich and the August, 1982 urodynamic study of Dr. Rhamy were completed could the permanency of the Plaintiff's disability be firmly established and an accurate prognosis and long-term treatment plan be developed. Such evaluations were first recommended by Dr. Poser after his initial examination of the Plaintiff on May 11, 1982. Both doctors testified that the recovery phase of GBS may extend over a few years and opined that it may be impossible and indeed misleading to attempt to predict the future course of the disease at an earlier point in time. Dr. Rosenblatt, a defense witness, also noted that it may take several months to years for the GBS symptoms to resolve. Significantly, Dr. Lichtenfeld testified that with respect to his own case of GBS virtually all the prognostications made at the two-year mark ultimately turned out to be wrong. As noted previously, prior to this year Plaintiff did not have the benefit of any significant neurological or urological treatment for her illness.[37] In fact, Joyce Harring, a registered nurse who appeared on behalf of the Plaintiff, testified that subsequent to her discharge from Allied, it appeared that Lucy McDonald was simply "dumped in her home and totally neglected." Under these circumstances, we believe it would be unreasonable to expect Plaintiff or her counsel to be apprised of the full medical and economic consequences of Lucy McDonald's disease process at the time the administrative claim was submitted.[38] In an analogous context, this Court has permitted an amendment of an administrative claim in a swine flu case on the basis that the illness involved was:

[A] very subtle and complex injury, an injury which is to this day a mystery to the medical field. Were we dealing with a broken arm or leg, we might impose upon the Plaintiff a more serious burden of proving that the present prognosis was discoverable. But inasmuch as we are dealing with the neurological effects of the injection of a drug, we are compelled to allow Plaintiff to amend his claim.

*Smargiassi v. United States,* Civ. No. 80–0389, Memorandum and Order at 2–3 (M.D.Pa. July 1, 1981). Numerous other decisions have also allowed claimants to recover in excess of the administrative demand in comparable situations. The most recent is *Campbell v. United States,* 534 F.Supp. 762 (D.Haw.1982), a case presenting a similar argument by the Plaintiff, where the district court, in denying the Defendant's motion to limit the Plaintiff's potential award, reasoned:

The full extent of [Plaintiff's] disability has been discovered only over a long period of time, extending from the date of her injury and, in fact, continuing to the present time.

36. Plaintiff's Proposed Findings of Fact on Motion to Amend Ad Damnum Clause of Complaint, ¶ 5 at 2.

37. Dr. Stanley Rosenblatt, a neurologist, who saw the Plaintiff on three occasions at Allied, testified that such consultations were not for the purposes of treatment and he did not recommend any testing or neurological care for the Plaintiff.

38. Indeed, at the time of the Plaintiff's discharge from Allied, no positive diagnosis of her illness had apparently been made. While the discharge summary noted that the final diagnosis was "probably transverse myelitis", there were other references in the Allied and WBGH records of Plaintiff's illness being GBS. See Plaintiff's Exhibit # 133A at 22; Exhibit # 132 at 7, 27.

Because the true nature of [Plaintiff's] condition has in some respects revealed itself only with the passage of time, it is not entirely clear whether the plaintiffs have presented "newly discovered evidence" or "intervening facts." The Court finds, however, that the newly alleged elements of injury fit under one or the other rubric. *That is, the full extent of [Plaintiff's] disability and future medical and care needs were either facts "not reasonably discoverable at the time of presenting the claim" or "intervening facts."*

*Id.* at 766 (emphasis added). The Court in *Campbell* relied primarily upon the holding in *Joyce v. United States,* 329 F.Supp. 1242 (W.D.Pa.1971), *vacated on other grounds,* 474 F.2d 215 (3d Cir.1973), a case involving complex head injuries, in which the Court stated:

> Here Plaintiff has met this burden [under § 2675(b)] by introducing a sufficient quantum of evidence at trial. In fact the medical evidence introduced by the plaintiff indicates the subtle nature of his injuries; he could not possibly have known their full monetary extent at the time of filing his administrative claim . . . . Only after extensive physical, psychological and psychiatric examination was it possible to determine the nature of the plaintiff's injuries. A rule that would require Plaintiff to know the full extent of his injuries when they are such that medical science cannot immediately establish them is neither logical or practical.

329 F.Supp. at 1247–48. Similarly, in *Bonner v. United States,* 339 F.Supp. 640, 651 (E.D.La.1972), the Court denied a defense motion to reduce the ad damnum clause of the complaint, finding that the "newly discovered evidence in this case is expert opinion evidence which wholly changed the case for evaluation of damages purposes, and neither plaintiffs nor their counsel could

reasonably have known the medical extent of [plaintiff's] disability at the time of the administrative claim." And in *Rabovsky v. United States,* 265 F.Supp. 587, 588 (D.Conn.1967), the defendant's motion to reduce the plaintiff's award was denied because the "medical extent of his injuries and expenses were not fully known and his attorney, therefore, was not in a position to appraise the value of his claim." Finally, in *Letoski v. U.S. Food and Drug Administration,* 488 F.Supp. 952, 958 (M.D.Pa.1979), the Court granted Plaintiff an award in excess of his administrative request on the grounds that "the full benefits of medical diagnosis were not available to him when he filed his claim."

In our view, the instant case falls squarely within the ambit of these decisions. At the time the Plaintiff's administrative claim was filed in November, 1978, no medical assessment had been made regarding Lucy McDonald's future neurological, urological and orthopedic requirements. The Plaintiff, without sufficient financial resources to do so, certainly cannot be faulted for this. Similarly, her counsel, having been retained only a few months before the statutory deadline for filing a claim expired,[39] could not reasonably have been expected to know or to ascertain in such a short period of time the complete future medical and economic effects of such an uncommon and enigmatic disease as GBS. Indeed, it has taken much medical effort and research to determine the exact parameters of the Plaintiff's disease and what that portends in terms of her future medical needs and the value of her present claim.

The Plaintiff next contends that she "presently evidences multiple physical changes that either were not present at the time of the filing of her Administrative Claim or were not discovered until May and August of this year."[40] The testimony and records of several of Plaintiff's medical wit-

---

**39.** See 28 U.S.C. § 2401(b). As previously noted, the Plaintiff received her swine flue inoculation in November, 1976 and the administrative claim was filed in November, 1978. See footnote 34, *supra.*

**40.** Plaintiff's Proposed Findings of Fact on Motion to Amend Ad Damnum Clause of Complaint, ¶ 9 at 5.

nesses, primarily Dr. Rhamy but also Drs. Penugonda and Poser, established the following recently discovered changes in Lucy McDonald's physical condition:

1) development of skin reaction including erythremia;

2) development of additional decubiti with pending decubiti over the greater trocanter;

3) development of tight heel cords;

4) development of bilateral organ enlargement, including enlargement of the kidneys;

5) development of degenerative changes in the lumbrosacral spinal area;

6) development of alkaline encrustations and calcium deposits in the bladder and wall;

7) development of urinary tract infection; and

8) development of osteoporosis.[41]

As a result of these new physical manifestations, it was also established that the Plaintiff is now increasingly prone to the development of additional decubiti, urinary tract infections and urinary stone formation. There also exists the possibility of kidney infection and/or complete renal failure with loss of the kidney. Moreover, in terms of damages, the testimony was uncontroverted that the development of these additional physical problems will have a substantial impact upon the extent, and obviously the cost, of the necessary present and future medical care for Lucy McDonald. It should be emphasized that there is no indication from the WBGH or Allied records submitted or from any of the testimony in this case that the Plaintiff was ever alerted to the possibility of such future urological, orthopedic and dermatological complications; thus, quite unlike the situation in *Kielwien v. United States*, 540 F.2d 676 (4th Cir.), *cert. denied*, 429 U.S. 979, 97 S.Ct. 491, 50 L.Ed.2d 588 (1976), a case relied upon the Defendant herein, the recent diagnosis of these physical changes is in no sense "cumulative and confirmatory of what Plaintiff had largely already been told."

*Id.* at 680. Accordingly, the future treatment costs for these recent medical developments could not reasonably have been anticipated at the time the Plaintiff's administrative claim was filed. We therefore find that such "newly discovered evidence" constitutes sufficient reason for an amendment of the administrative claim and *ad damnum* clause of the complaint under § 2675(b). See *Foskey v. United States, supra; Joyce v. United States, supra; Rabovsky v. United States, supra.*

Another factor proffered in support of the motion to amend the administrative claim is the changed mental status of Lucy McDonald. The testimony of Dr. Anthony Turchetti, a psychiatrist, was presented by the Plaintiff on this issue. He noted that apparently the only prior psychiatric evaluation of the Plaintiff occurred at Allied on September 14, 1977 by a Dr. Lesniak. Dr. Lesniak's consultation note indicated that Lucy was undergoing a "transient" period of adjustment disorder but no medication was prescribed at that time. Dr. Turchetti has since evaluated the Plaintiff on several occasions. He testified that after his latest psychiatric interview of her in early December, 1982, he now believes she is suffering from an adjustment disorder with mixed emotional features of anxiety and depression. Specifically, he found her to be more depressed than on previous consultations, more concerned about her future and the prospects of having to endure it in a nursing home, and greatly distressed about the health of her husband and his continuing ability to care for her daily needs. Plaintiff's present mood disorder has manifested itself in periods of prolonged irritability and extreme frustration in which she throws objects and tears the sheets and clothing she has unknowingly soiled with urine or feces. Dr. Turchetti opined that this existing adjustment disorder is no longer "transient" but would require some supportive psychotherapy for a period of six to twelve months and possible future hospitalization if favorable results were not forthcoming. We believe that this uncontroverted testi-

41. See *id.* at 5-6.

mony of the altered emotional condition of Lucy McDonald and her corresponding need for psychiatric counselling can be classified as either "newly discovered evidence" or an "intervening fact" which warrants an upward monetary adjustment of the administrative claim in accordance with § 2675(b). See *Nightingale v. United States,* Civ. No. 79–448–RE (D.Or. Feb. 17, 1981); *Letoski v. U.S. Food and Drug Administration, supra; Bonner v. United States, supra.*[42]

In addition to the various medical reasons discussed above, the Plaintiff also contends that the Supreme Court of Pennsylvania's recent decision in *Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980) constitutes an "intervening fact" relating to the amount of her claim and, therefore, justifies an increase in the amount demanded at the administrative level. In *Kaczkowski,* the Court reversed prior Pennsylvania law governing the calculation of damages for future lost earnings by holding that it would no longer be necessary to discount such damages to present value.[43] Two other district court decisions in this circuit have found that this unpredictable change in Pennsylvania damage law entitled the plaintiff to seek an amount in excess of the administrative claim. See *Gallimore v.*

*United States,* 530 F.Supp. 136 (E.D.Pa. 1982); *Funston v. United States,* 513 F.Supp. 1000 (M.D.Pa.1981). In *Gallimore,* the Court stated:

> The change in the Pennsylvania law concerning the measurement of damages for future loss of earnings brought about by the Pennsylvania Supreme Court's decision in *Kaczkowski v. Bolubasz, supra,* clearly has a significant impact on the amount of damages that plaintiff is entitled to claim .... [C]onsidering that this court must look to Pennsylvania law for the measure of damages and since it would have been impossible to predict this change in longstanding Pennsylvania precedent at the time plaintiff filed her administrative claim, it seems reasonable to view this change as an intervening event that justifies amendment under section 2675(b) of plaintiff's claim.

530 F.Supp. at 138. We concur in this reasoning and similarly hold that the new method for computing future lost earnings set forth in the *Kaczkowski* decision represents an "intervening fact" under 28 U.S.C. § 2675(b).[44]

In view of the foregoing discussion,[45] the Court concludes that the Plaintiff has ad-

---

42. While Lucy McDonald's psychiatric condition is currently not as severe as the plaintiffs in *Nightingale, Letoski,* and *Bonner,* nonetheless, her newly developed emotional problems clearly constitute a change in circumstances as is contemplated by § 2675(b). We find no support in the unambiguous language of the statute or its legislative history which would require that the "newly discovered evidence" or "intervening facts" advanced by the plaintiff must "wholly change[ ] the case for evaluation of damages purposes", and we respectfully disagree with such an analysis as set forth in one of the cases cited by the Defendant, *Southwick v. United States,* Civ. No. 80–3011 (S.D.Ill. June 24, 1981). See Defendant's Brief in Opposition to Plaintiff's Motion for Leave to Amend Complaint (Doc. # 19) at 2.

43. The theoretical premise of this decision is that future inflation and future interest rates are presumed to be equal and cancel one another. The application of the "total offset" rule has been held to be appropriate in an action brought under the Swine Flu Act. *Barnes v. United States,* 685 F.2d 66, 70 (3d Cir.1982).

44. Since Plaintiff is entitled to an overall increase in the amount she claimed administratively on the basis of the previous reasons discussed, the Court need not decide whether the *Kaczkowski* rule would warrant an increase only with respect to the amount attributable to lost future earnings or to the entire claim in general. See *Gallimore v. United States, supra,* 530 F.Supp. at 139 n. 3 (adjustment only in lost earnings element of damages). We note, however, that at trial the Plaintiff's expert economist testified that the difference in Lucy McDonald's future economic loss prior to and subsequent to *Kaczkowski* was approximately $325,000.00. See Plaintiff's Exhibit # 329.

45. While it is not necessary for a decision on the pending motion, the Court notes that the trial testimony of the Plaintiff, Dr. Rhamy and Dr. Turchetti established that Francis McDonald's congenital hearing deficit has worsened over the past year to the point where he often must lipread to understand Lucy and she must use hand signals to communicate with him. Such difficulties have obviously impacted upon his ability to provide any rough form of

duced sufficient proof of "newly discovered evidence" and/or "intervening facts" to satisfy the dictates of § 2675(b) [46] and, therefore, her motion to amend the *ad damnum* clause of her complaint to reflect damages in excess of the monetary amount requested at the administrative level will be granted.

### B. Applicable Law and Measure of Recovery

■ In an action brought under the Federal Tort Claims Act, it is "the law of the state where the act or omission occurred" which provides the applicable standards of substantive liability. 28 U.S.C. § 1346(b); see *Richards v. United States,* 369 U.S. 1, 8–10, 82 S.Ct. 585, 590, 7 L.Ed.2d 492 (1962); *Gallick v. United States,* 542 F.Supp. 188, 189 (M.D.Pa.1982). Since the Swine Flu Act incorporates by reference the liability provisions of the Federal Tort Claims Act, state law standards also apply to claims brought pursuant to the Swine Flu Act. *Petty v. United States,* 679 F.2d 719, 726 (8th Cir.1982). Lucy McDonald received her swine flu vaccination in Pittston, Pennsylvania and, therefore, the Pennsylvania law of damages for personal injuries governs the extent of the Defendant's liability in this action. See *Barnes v. United States, supra,* 685 F.2d at 68; *Foskey v. United States, supra,* 490 F.Supp. at 1062.

■ In Pennsylvania, the courts have consistently held that "damages are to be compensatory to the full extent of the injury sustained." *Kaczkowski v. Bolubasz, supra,* 491 Pa. at 566, 421 A.2d 1027; see *Incollingo v. Ewing,* 444 Pa. 299, 307, 282 A.2d 206 (1971); *McLane v. Pittsburgh Rys. Co.,* 230 Pa. 29, 34, 79 A. 237 (1911). Under this state's law, a plaintiff is entitled to be compensated for all past medical expenses

reasonably and necessarily incurred and all future medical expenses reasonably likely to be incurred for the treatment and care of his injuries; past lost earnings and lost future earning capacity; and past, present and future pain and suffering. *Owens v. Peoples Passenger Railway,* 155 Pa. 334, 342, 26 A. 748 (1893); see *McClinton v. White,* 285 Pa.Super. 271, 277, 427 A.2d 218 (1981) (survival action); *Frankel v. United States,* 321 F.Supp. 1331, 1336–39 (E.D.Pa. 1970); *aff'd sub nom., Frankel v. Heym,* 466 F.2d 1226 (3d Cir.1972). See generally *Pennsylvania Suggested Standard Jury Instruction: Civil,* §§ 6.01 A–I (PBI 1981). A plaintiff in Pennsylvania must only prove these elements of damage with reasonable certainty. *Barnes v. United States, supra,* 685 F.2d at 69.

> The "law does not require that proof in support of claims for damages or in support of compensation must conform to the standard of mathematical exactness." *Lach v. Fleth,* 361 Pa. 340, 352, 64 A.2d 821, 827 (1949). All that the law requires is that "(a) claim for damages must be supported by a reasonable basis for calculation; mere guess or speculation is not enough." *Stevenson v. Economy Bank of Ambridge,* 413 Pa. 442, 453–54, 197 A.2d 721, 727 (1964). See also, *Small [Smail] v. Flock,* 407 Pa. 148, 180 A.2d 59 (1962); *Getz v. Freed,* 377 Pa. 480, 105 A.2d 102 (1954). "If the facts afford a reasonably fair basis for calculating how much plaintiff's entitled to, such evidence cannot be regarded as legally insufficient to support a claim for compensation." *Western Show Co., Inc. v. Mix,* 308 Pa. 215, 162 A. 667 (1932).

*Kaczkowski v. Bolubasz, supra,* 491 Pa. at 567, 421 A.2d 1027; see *Pratt v. Stein,* 298 Pa.Super. 92, 444 A.2d 674, 696–98 (1982); *Gordon v. Trovato,* 234 Pa.Super. 279, 286,

---

"nursing" care for Lucy. At trial, the Plaintiff testified that on several occasions she has involuntarily urinated or had a bowel movement and has been unable to immediately summon her husband for assistance.

**46.** See *United States v. Alexander,* 238 F.2d 314, 318 (5th Cir.1956), wherein the Court noted that a determination of whether the inter-

vening events "should be treated under the category of newly discovered evidence rather than as intervening facts" was not necessary because they were "clearly one or the other and, being so, the plaintiff is not limited in his recovery to the amount of his administrative claim." See also *Foskey v. United States,* 490 F.Supp. 1047, 1061 (D.R.I.1980).

338 A.2d 653 (1975). See also *Story Parchment Co. v. Paterson Parchment Paper Co.,* 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931) (reasonable certainty rule bars only those damages which "are not the certain result of the wrong, not ... those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.").

### 1. Past Medical Expenses

The parties have stipulated that the reasonable and necessarily incurred past medical expenses related to Lucy McDonald's present illness total $56,645.18.[47]

### 2. Future Medical Expenses

■ It was unequivocally confirmed by every physician testifying in this case that Lucy McDonald's primary medical deficits of lower extremity paraplegia and bowel and bladder dysfunction are now permanent. As a result of this debilitating condition, she will require, among other things, the constant care and treatment of professionally trained medical personnel in order to prevent the serious complications sometimes associated with her present illness, such as prolonged hospitalization, surgical intervention, and inordinately expensive therapy. At trial and in an earlier report,[48] Dr. Rhamy outlined the essential treatment,

its cost, and some of the prophylactic measures which should be taken in an effort to care for and rehabilitate the Plaintiff over the remaining years of her life. In this regard, the Court finds that based on the United States Life Expectancy Tables,[49] Lucy McDonald's present life expectancy is approximately 40 years. Dr. Rhamy expressly indicated that with the appropriate medical attention he has recommended, Lucy McDonald can expect to attain this normal life expectancy. In calculating an award for the future medical expenses to which the Plaintiff is entitled to in this case, we have divided this element of damages into four areas: medical treatment, nursing care, miscellaneous equipment and devices, and architectural changes in the Plaintiff's house. We will address these items *seriatim.*

### a. Medical Treatment

The Plaintiff does and must continue to take numerous medications for problems related to her present neurological and urological condition. The total lifetime costs of these medications is $33,499.00.[50]

In an effort to prevent osteoporosis of the bones, a common phenomenon in paraplegics, regular orthopedic evaluations must be undertaken at a cost of $100.00 per year

---

47. See Plaintiff's Exhibit # 360 for a detailed breakdown of the specific items of damage under this category.

48. Plaintiff's Exhibit # 310.

49. United States Department of Health and Human Services, Volume 2, § 5 (1978). The Pennsylvania Supreme Court has accepted the reliability of these mortality tables in calculating a person's life expectancy. *Kaczkowski v. Bolubasz, supra,* 491 Pa. at 574 n. 17, 421 A.2d 1027; *Brodie v. Philadelphia Transport Co.,* 415 Pa. 296, 203 A.2d 657 (1959); see also *Flick v. James Monfredo, Inc.,* 356 F.Supp. 1143, 1150 (E.D.Pa.), *aff'd,* 487 F.2d 1394 (3d Cir.1973); *Larsen v. IBM Corp.,* 87 F.R.D. 602, 610–11 (E.D.Pa.1980). Both economists noted that these tables are based on actual vital statistics of individuals in good and bad health and their purpose is to project an average life expectancy of a person according to such factors as age, sex, and race. In view of the explicit approval of these tables by the highest court of this Commonwealth and in deference to the credi-

ble medical testimony presented at trial that Lucy McDonald's life expectancy, assuming proper medical attention, should be in conformity with these government statistics, the Court does not accept as a reliable indicator of the Plaintiff's life expectancy in this case the insurance tables mentioned by Dr. Reavy.

50. The required medications and their costs are as follows:

| Drug | Yearly Cost | Lifetime Cost |
|---|---|---|
| Hiprex | $248.20 | $ 9,928.00 |
| Probanthine | 81.37 | 3,263.00 |
| Ducolax Supp. | 37.50 | 1,500.00 |
| Gantrisin | 64.84 | 2,574.00 |
| Doxidon | 203.40 | 8,136.00 |
| Leoriseal | 202.45 | 8,098.00 |
| Total | $837.76 | $33,499.00 |

See Plaintiff's Exhibits # 305, 310, ¶ 1. The prices are those of Thrift Drugs in Pittston, Pennsylvania as of August 10, 1982.

and $4,000.00 over the Plaintiff's lifetime. As an additional orthopedic measure, an award of $7,200.00 will be made for the reasonable likelihood of future surgery to correct para-articular calcification of the hip joints, which occurs in one-half of all paraplegics.[51]

With respect to the Plaintiff's skin condition, Dr. Rhamy testified that it is very likely, a 68% chance, that the Plaintiff will develop additional decubiti over the sacral part of her body. He estimated the cost of treatment, including possible surgery, to range from $16,500.00 to $68,000.00.[52] The Court will award $16,500.00 for such future care.

Lucy McDonald's urological condition will require the closest monitoring and the most frequent treatment because of her permanent bowel and bladder dysfunction. In an earlier report, Dr. Rhamy graphically portrayed the Plaintiff's present urological status:

> This is a lady with insulin dependent diabetes mellitus who sits in a pool of urine contaminated with feces and with a residual urine, and thus she represents a prime candidate for urinary tract infections. The short urethra of the female allows bacterial contamination of the bladder on a daily basis even under the best of circumstances. Here we have a diabetic in whom we have a very high innoculum of bacteria in the area around the urethral orifice and in whom we have a very significant amount of residual urine in the bladder which allows these bacteria to grow. In view of the above situation, one cannot overlook significant likelihood of the development of urinary tract infections with resulting pyelonephritis, renal damage, and even renal failure.
>
> Mrs. McDonald has had positive urine cultures previously. Since she has no sensation she will have none of the usual warning symptoms and signs of cystitis; therefore, routine cultures of the urine are essential. It is imperative that she have frequent examinations of her urinary tract in an effort to prevent the complications of stone, hydronephrosis, and renal failure.
>
> It is also important that she have frequent examinations of her other organ systems so as to prevent the complications of paraplegia, neurogenic bladder and diabetes mellitus as these can be very serious requiring hospitalization, surgery, and renal dialysis and even renal homotransplantation.

His trial testimony was consistent with this report and, in reliance upon these sources, as well as the testimony of Drs. Lichtenfeld and Poser and Nurse Harring, the Court will approve most of the urological treatment recommendations and award $135,550.00 as damages for such requirements.[53] The total amount of the medical treatment expenses is therefore $197,749.00.

---

51. See Plaintiff's Exhibit # 310, ¶ 2.

52. See Plaintiff's Exhibits # 303, 310, ¶ 3.

53. The medical procedures and their costs are as follows:

| | Lifetime Cost |
|---|---|
| 1. Culture and Urological Office Visit every two months – $300.00 per annum | $ 12,000.00 |
| 2. IVP Testing twice/year – $220.00 per annum | 8,800.00 |
| 3. Urodynamic Testing every six months $400.00 per annum | 16,000.00 |
| 4. Increased antibiotics $6.00 per day estimated for a period of five years | 10,950.00 |
| 5. Hospitalization for the treatment of urinary tract infection – estimated at 40 days over life expectancy at $1,785.00 per diem | 71,400.00 |
| 6. Costs for treatment of recurring stone disease | 17,400.00 |
| TOTAL | $136,550.00 |

See Plaintiff's Proposed Findings of Fact, Exhibit A, Items 1–6. In reference to numbers 4 and 5, we note that the need for such treatment is certain, as Dr. Rhamy established, and we find that the estimated temporal period for each to be reasonable. We make no award for items 7 and 8 set forth in Exhibit A, the care for hydroneplurosis and urinary diversion; the testimony did not establish these as reasonably likely to be incurred, especially if the procedures approved above are followed. The Court also notes that none of the calculations in this

### b. Nursing Care

As previously noted, the testimony at trial was, in the Court's view, persuasive in demonstrating that the Plaintiff will require continual nursing care throughout her lifetime to prevent and treat the potential serious complications of her disease. The issue that arises, however, for the Court's determination in awarding damages is the degree or type of nursing care which is reasonably necessary for the Plaintiff. Several options were referred to at trial.

At the outset, the Court rejects the government's proposal regarding institutionalized care or apartment-type community living for the handicapped for Lucy McDonald. These options were suggested by the Defendant's expert economist, Dr. George Reavy, solely from an economic standpoint and were unsupported by any medical evidence establishing them as feasible alternatives for this particular Plaintiff. On the other hand, Plaintiff herself testified that it is very important for her to stay in her present home; she describes it as being the "family homestead" and the gathering place for her brothers and sisters and their families. Dr. Turchetti, a psychiatrist, opined that such alternatives as proffered by the government would be markedly detrimental to the Plaintiff's emotional condition. He stated that to Lucy McDonald her present home represents security and to strip her away from this would be "cruel". These observations were also confirmed by Joyce Harring, a registered nurse, who is experienced in the care of paraplegics and is presently involved in such treatment with another paraplegic. She testified that institutionalization or handicapped community living would not be a viable alternative for Lucy McDonald because she is "very secure in her own home", and opined that Lucy "would lose the will to go on" if she must live in that environment. Dr. Rhamy also testified that, in his opinion, an extended care treatment center would not be conducive to the normal interpersonal relationship of a husband and wife. Based on this uncontradicted medical testimony and in a compassionate sense of fairness to the plight of the Plaintiff, the Court concludes that the Defendant's proposals are not a reasonable solution to this Plaintiff's present and future nursing care needs.

Dr. Rhamy testified as to two alternatives, a "low" and "high" nursing care plan for the Plaintiff. The "low" plan consisted of a licensed practical nurse (LPN) for one eight-hour shift and a helper or nurse's aid for the other 16 hours of the day, seven days of the week. The "high" alternative would be an LPN on an around the clock basis, seven days of the week.[54]

Dr. Lichtenfeld and Nurse Harring both testified that the services of a registered nurse (RN) are necessary for Lucy McDonald. In an earlier report,[55] Nurse Harring outlined the reasons for such care for this patient:

> I feel Mrs. McDonald should have all the supportive help she needs to accomplish as closely as possible the life style she was accustomed to before the onset of her illness, and most importantly she would be able to resume a husband-wife type marriage with her husband instead of nurse-patient relationship it has been the past five years.
>
> It is my opinion this can be realized with around-the-clock nursing care and mechanical aids to assist her. She needs a Registered Nurse at least five, eight-hour shifts a week. Her duties would entail setting up a good nursing care program, which would include coordinating with her physicians, monitor the administration of medication and diet, managing her complete care and being an objective supporter. The remainder of shifts could be handled by an L.P.N. and a trained nurse's aide. With this care she should

case reflect any projected increases in the cost of future medical care.

**54.** See Plaintiff's Exhibit # 310, ¶ 4. The lifetime costs of the low and high plans would be $1,746,000.00 and $2,890,800.00, respectively.

**55.** Plaintiff's Exhibit # 334 at 3.

be able to live a reasonably healthy and long life.

I feel it is most important that she have a Registered Nurse to set up a nursing care program and manage it because Mrs. McDonald has many medical problems that are intertwined and made more life-threatening because of her paralysis and loss of sensation; for instance, in diabetes any wound is much slower to heal and with loss of sensation, she can't even feel soreness beginning and it could be too late by the time the visual effect is seen. As she becomes older her medical problems will become worse with the aging process and will especially require expert help to keep her from life-threatening situations such as the before-mentioned urinary tract infections and decubiti as well as the feet.

I agree with Dr. Rhamy's opinion that she is in grave danger of kidney complications in the future, and this alone makes it imperative that she have the expert nursing care and management an R.N. can give her.

Her trial testimony was in accord with this report as she noted that the primary areas of concern in this patient with which an RN should be involved are a bowel management program, monitoring of her diet, physical therapy, coordinating with physicians on her medications and physical condition, and psychological support. Dr. Lichtenfeld was of the opinion that an RN should be available on a daily basis, presumably for 24 hours, and also a physical therapist several times a week. Nurse Harring presented a schedule of nursing care for the Plaintiff which, considering all the medical testimony presented regarding the Plaintiff's present physical status and her future medical needs, the Court finds to be the most feasible option in this case. This plan consists of: (1) the services of a RN for one eight-hour shift per day for five days of the week (40 hours per week); (2) the services of an LPN for one eight-hour shift for seven days of the week (56 hours per week); and (3) the services of a nurse's aide or helper for the remaining shift during the week and the extra shift on the weekends (72 hours per week). Nurse Harring also testified that the reasonable and average eight-hour shift rate in this geographical area for an RN is $75.00 and for an LPN is $65.00. It was earlier established by Dr. Rhamy that the nurse's aide or helper would be a minimum wage worker at a present rate of $3.35 per hour. Computing these hourly figures over the life expectancy of the Plaintiff, the Court will award $2,228,096.00 as damages for the reasonable future cost of necessary nursing care for the Plaintiff.[56]

### c. Miscellaneous Equipment and Devices

As previously referred to, the Plaintiff's present life expectancy is approximately 40 years. The uncontroverted testimony of several of Plaintiff's expert medical witnesses, specifically Drs. Rhamy, Lichtenfeld and Poser and Nurse Harring, established that at present and over the course of her entire lifetime Lucy McDonald will require numerous items of paraplegic equipment to assist her in maintaining a state of optimum physical health. At trial, Dr. Rhamy gave a detailed account of the need for and cost of such equipment and the Plaintiff relies primarily upon his testimony. The Court has reviewed the Plaintiff's itemization of costs on this issue, as set forth in Exhibit B of Plaintiff's Proposed Findings of Fact, in conjunction with the testimony presented by all the medical witnesses at trial and, after doing so, we conclude that this listing constitutes a reasonable estimate of the necessary expenditures for paraplegic equipment for a person in the Plaintiff's condition. The items approved and their cost over the 40 year span of the Plaintiff's remaining life expectancy are as follows:

| 1. | Wheelchair—$790.00— chair replaced every 3 years | $10,270.00 |
|---|---|---|

---

56. The weekly cost under this nursing plan is $1,071.20; thus, the yearly figure would be $55,702.40 and, accordingly, calculating this yearly rate over the 40 year life expectancy of the Plaintiff produces the sum of $2,228,096.00. We believe this to be a conservative amount since no doubt the cost of nursing care will greatly escalate over the next forty years.

| | | |
|---|---|---|
| 2. | Roho pad for wheelchair—$230.00—replaced every year | $ 9,200.00 |
| 3. | Hydraulic lift [for tub] | 1,800.00 |
| 4. | Electric bed—$1,500.00—replaced every 10 years | 6,000.00 |
| 5. | Alternating pressure mattress—$300.00—replaced every year | 12,000.00 |
| 6. | Home lift in house | 11,000.00 |
| 7. | Elastic stockings—$280.00 per year | 11,200.00 |
| 8. | Special shoes—$280.00 per year | 11,200.00 |
| 9. | Parallel bars | 1,000.00 |
| 10. | Long leg braces—$1,700.00—replaced every two years | 34,000.00 |
| 11. | Hydraulic lift van-transportation—$25,000.00—replaced every 6 years | 150,000.00 |
| | TOTAL | $257,670.00 |

The final item listed, the van, deserves brief comment. Dr. Rhamy and Nurse Harring testified specifically as to the necessity of this mode of transportation for a paraplegic, especially one with a bowel and bladder disorder. Plaintiff is unable to move independently, or even easily with assistance, from her wheelchair into a regular automobile. As a result, at times the ordeal of the transfer process not only physically tires her but it also causes undue pressure upon her bladder and involuntary urination. Dr. Rhamy as well as Dr. Turchetti noted that a van would be important for Lucy McDonald's emotional well-being also, in that it would greatly facilitate her access to numerous social activities and thereby assist her in regaining some of the self-esteem and respect she now so obviously lacks. Dr. Rhamy poignantly described the Plaintiff's present status as a "prisoner in her own house." Nurse Harring concurred in these observations in her trial testimony and, additionally, in an earlier report,[57] commented upon the significance of a van for the Plaintiff's social life, which has been severely disrupted as a consequence of her present illness:

Once her bowel and urinary habits are under control and managed, I feel she will be able to resume some sort of social life that a woman of her young age would enjoy, such as having her hair done, shopping, going to the movies, visiting friends and family, and going to church. To make this easier for her a van with a drop-lift ramp for the wheelchair would be less tiring for her. This van would also enable her to go to her doctor's office more easily and resume going for regular check-ups that she would have done under normal circumstances had she not been incapacitated, such as gynecologist for an exam and pap smear, the dentist, and opthomologist.

The Plaintiff herself testified that a van would be most useful for these daily activities and would also enable she and Francis to resume taking weekend trips to visit friends and relatives as they did prior to her disability.

Under these circumstances, we believe that the necessary cost for a hydraulic-lift van, as established by Dr. Rhamy and unchallenged by the Defendant, is a proper element of damages in the instant case.

### d. Necessary Architectural Changes in Plaintiff's House

The Court received into evidence at trial a report prepared by Richard Hardy, an architect, in the firm of Pyros & Sanderson, Wilkes-Barre, Pennsylvania, outlining proposed alterations to the McDonald home to suitably accommodate Lucy in her present condition. See Plaintiff's Exhibit # 335.[58] The total estimated cost of this project is $77,000.00. The propriety of the architectural changes is consistent with the testimony of Drs. Rhamy and Lichtenfeld and Nurse Harring, and was not contradicted by the testimony of any defense witnesses. After examining the specifics of this plan, the Court finds that the recommendations and estimates contained therein are both

---

**57.** Plaintiff's Exhibit # 334 at 2.

**58.** Counsel for the parties stipulated that it was not necessary for Mr. Hardy to personally ap-

pear as a witness at trial and that if he did, his testimony would be consistent with his report.

reasonable and necessary to enable the Plaintiff to adjust as conveniently as possible to her paraplegic lifestyle.[59]

### 3. Lost Earnings

The testimony on this issue was presented by Dr. Andrew Verzilli, Professor of Economics, Drexel University, on behalf of the Plaintiff, and by Dr. George C. Reavy, Economic Consultant, University of Scranton, for the Defendant.

### a. Wages

There was no dispute in this case that the amount of the past lost wages sustained by the Plaintiff from December, 1976 until the date of trial was $44,800.00.[60]

■ Under Pennsylvania law, "[w]hen an injury is a permanent one, one which will cause a loss or lessening of future earning power, a recovery may be had for the probable loss of future earnings." *Kaczkowski v. Bolubasz, supra,* 491 Pa. at 566 n. 7, 421 A.2d 1027, quoting McCormick, *Damages* at 299 (20th reprint 1975). The Court must determine to what extent there has been "a loss of earning power and of ability to earn money." *Mazi v. McAnlis,* 365 Pa. 114, 121, 74 A.2d 108 (1950). The test is whether "the economic horizon of the [Plaintiff] has been shortened because of the injuries sustained . . . ." *Holton v. Gibson,* 402 Pa. 37, 44, 166 A.2d 4 (1960), quoting *Bochar v. J.B. Martin Motors, Inc.,* 374 Pa. 240, 244, 97 A.2d 813 (1953). See *Funston v. United States, supra,* 513 F.Supp. at 1006.

■ On this issue of Lucy McDonald's lost future earnings, there was disagreement between the expert economists on the initial factor of the Plaintiff's work-life expectancy. Dr. Verzilli's calculations were based on an assumed retirement age of 65, an approximately 26 year future work life period. Dr. Reavy's projection of a 15.19 year work life expectancy for the Plaintiff,

on the other hand, was founded upon the U.S. Department of Labor, Tables for Working Life for Men and Women (1977).

The Plaintiff argues that the utilization of these tables in this case would be inappropriate because they unjustly interdict a consideration of her particular economic condition. At trial, Dr. Reavy, upon cross-examination, indicated that one of the principal contributing factors to the shortened work life expectancy of a female, as reflected in these tables, is the prospect of child-bearing and the concomitant departure from the work force by a woman. In this case, however, the McDonalds did not have any children at the time Lucy, then 33, contracted GBS and, as a result of this illness, it is exceedingly unlikely they ever will. Moreover, as noted, shortly after the onset of her disease, the Plaintiff's husband, Francis, was seriously injured and remains physically disabled for social security purposes. The Plaintiff also testified that she enjoyed her work at Lee Manufacturing and would have continued there if not for her illness. On this latter point, Leo Gutstein, the owner of Lee Manufacturing, testified that Lucy was a valued employee and a presser position would have remained available to her if she did not become disabled.

In determining the Plaintiff's "probable" loss of future earnings in light of these circumstances, particularly her husband's inability to provide an income for the household, the Court concludes that the Plaintiff would have remained in the work force until age 65. Thus, her present work life expectancy is 26 years.

With respect to the Plaintiff's future earnings figure, both economic experts, relying upon the testimony of Mr. Gutstein, used an average annual figure of $13,-650.00. Specifically, Mr. Gutstein testified that if Lucy was presently employed as a

---

**59.** Mr. Hardy also outlined and estimated the cost of constructing a new one-story custom home as an alternative to remodeling the McDonald's present home. Such a project would cost approximately $135,665.00; however, as noted previously, the Plaintiff has no desire to

nor is it psychologically advisable for her to vacate the present family residence.

**60.** See Plaintiff's Exhibit # 326; Defendant's Exhibit # 161.

presser in his facility, she would be earning $7.50 per hour and working an estimated 35 hours per week. Computed over a 52 week period, these wages translate into an annual salary of $13,650.00. The Court accepts this as a reasonable method of arriving at the Plaintiff's annual earnings figure.

The Plaintiff also seeks an upward adjustment of this yearly amount by a 2% productivity factor in accordance with the standards set forth by the Supreme Court of Pennsylvania in *Kaczkowski v. Bolubasz, supra.* In *Kaczkowski,* the Court concluded that both a productivity factor and inflation should be reflected in an award of lost future earnings. *Id.* at 566, 421 A.2d 1027.

Inflation and productivity increasingly demand judicial attention, particularly with respect to personal injury action damages for lost future earnings. Traditionally, evidence of future inflation and productivity increases have been deemed too speculative to be included in calculating future damages even though inflation and productivity increases may drastically reduce an initially generous award. 18 *Washburn L.J.* 499 (1979). However, today, in light of clear scientific evidence of the fact that inflation and productivity have become an established part of our economy, it becomes necessary that these factors be considered in such awards. [T]he assertion that productivity factors are too speculative to consider in computing lost future earnings is ... fallacious. An individual's future earning capacity is capable of estimation based upon objective factors of age, maturity, education and skill. Henderson, *Consideration of Increased Productivity and Discounting of Future Earnings to Present Value,* 20 S.D.L.Rev. 307, 312 (1976). A determination of an individual's future earning capacity based on objective criteria is far

less speculative than most other estimates made by the trier of fact.

491 Pa. at 566–67, 573–74, 421 A.2d 1027.[61]

In this case, Dr. Verzilli, the Plaintiff's economist, testified that based on the Plaintiff's actual earning history at Lee Manufacturing and the testimony of Leo Gutstein, the owner of Lee Manufacturing, a 2% productivity factor for the Plaintiff would be appropriate. Mr. Gutstein testified that despite some industry declines, his business has grown substantially from the time period of 1976 to the present. He attributes this to diversification of his business through the addition of more product lines. In terms of productivity of his employees, he stated that Lee Manufacturing has made substantial capital expenditures for automated equipment, which has resulted in: (1) production being greater with a consistent work force, and (2) his shops and its employees earning substantially above the industry standards. Finally, in his role as financial planner for the company, he estimated that the future growth of Lee Manufacturing, exclusive of inflation, would be 3 to 5 percent annually. Additionally, Dr. Verzilli stated that this two percent figure is actually lower than the Plaintiff's past growth rate from 1970 to 1976. He further noted that it would be unrealistic to assume no growth in the Plaintiff's future earnings.[62]

Dr. Reavy, the Defendant's economist, was of the opinion that no productivity factor increase was warranted in this case. In determining this, he measured the percentage change in the Plaintiff's hourly wage rate in 1973 of $4.43 per hour, to the present estimated rate of $7.50 per hour. He determined that although this indicated a 69.3% increase in the Plaintiff's hourly wage rate, when compared to the rise in the consumer price index of 120.4% for the

61. See generally *Pennsylvania Supreme Court Review*-1980, 54 Temp.L.Q. 576 (1981).

62. The Court in *Kaczkowski* also quoted approvingly the following passage from the aforementioned law review article:

"[R]egardless of the pattern of the increase in income over the life-cycle, the probability that one's money income will not rise, on an

annual basis, approaches zero. There is little or no reason for disputing the fact that money earnings rise, the only problem is by how much, or at what rate, an issue which largely depends upon the segment of the labor market being investigated." 20 S.D.L.Rev. at 312.

same time period, he concluded that there had been no real growth in the Plaintiff's wages. The Court is of the view, however, that this method of comparison does not accurately reflect the *Kaczkowski* Court's concept of productivity or "merit" increases. See *id.* at 565 n. 5, 421 A.2d 1027. It should be borne in mind that the consumer price index is the government's measure of inflation, the impact of which has already been taken into account with future interest rates under the total offset approach of *Kaczkowski.*[63] The inflation figure, therefore, should not be the sole factor considered in the computation of a productivity component, a "separate and distinct phenomena" which is "controlled by different variables than the inflationary factor." *Id.* at 570, 565 n. 5, 421 A.2d 1027. As noted above, a consideration of future wage or productivity increases should be based on such factors as the age, experience, skill, and education of the individual as well as, we believe, the future economic condition of the particular industry or company with which the individual would have been employed if not for the permanent injuries sustained. See 54 Temp.L.Q. 576, 586–87 n. 81. Such an analysis entails, by necessity, an *ad hoc* case-by-case determination.

In view of the testimony adduced by the Plaintiff's expert economist and by her former employer, the Court finds that a proper foundation has been laid in this case to justify the requested 2% productivity factor adjustment in the amount of Plaintiff's lost future earnings. While we recognize, as did the court in *Kaczkowski,* that such an award "may be subject to a degree of speculation", nonetheless, we also share that tribunal's view that "it is exceedingly more accurate to assume that the future will not remain stagnant with the past." *Id.* at 580,

421 A.2d 1027.[64] The Plaintiff's future lost earning capacity in this case is therefore $437,209.00.[65]

With respect to fringe benefits, both economists agreed that this item constitutes a significant portion of the financial package for a worker and has traditionally been considered as part of compensation. In this case, Dr. Verzilli opined that a 20% adjustment to earnings should be made to account for such benefits. He reached this conclusion by examining the union (ILGWU) contract relative to Lee Manufacturing Company for the years 1979 through 1982, which establishes and identifies the contributions based on the worker's payroll that would be provided by the employer, on behalf of its employees, for three types of benefits: (1) a health and welfare fund; (2) a retirement fund; and (3) a health services plan.[66] Dr. Reavy, however, examined these documents and concluded that an appropriate value for these benefits would be approximately 5% of earnings. After careful consideration of the testimony of both the economic experts and after reviewing the relevant sections of the union contract and other documents submitted,[67] the Court finds that a reasonable estimate of the value of fringe benefits in this case is 15 percent of past and future lost earnings, or $72,301.35.

### b. Household Services

■ The Plaintiff also seeks compensation for the past and future value of the daily household services she is unable to perform because of her illness. See *Link v. Highway Express Lines, Inc.,* 444 Pa. 447, 452–53, 282 A.2d 727 (1971). Considering the particular factual circumstances of this case, however, the Court finds that such an award would not be appropriate.

63. See footnote 43, *supra.*

64. In Posner, *Economic Analysis of Law* (2d ed.1977), the author comments that in general a 3% productivity factor would be the appropriate figure to utilize in computing lost future earnings. He further notes that such average annual increases are "felt even in industries where productivity is not increasing secularly: employees in such industries must raise wages

to levels competitive with those in other industries or lose their work force." *Id.* at 147, n. 5.

65. See Plaintiff's Exhibit # 326.

66. See Plaintiff's Exhibit # 316 at 30 (Article Twenty-Ninth: Benefit Funds).

67. See Plaintiff's Exhibits 315, 317.

The Plaintiff did testify that presently she is able to do some cooking, cleaning and laundry, albeit in a limited capacity. Apparently the remainder of these household tasks has previously been undertaken by her husband, Francis, who has been required to stay at home at all times to care for Lucy. There was no indication from the testimony that the McDonalds have incurred any additional expenses for such services from the onset of the Plaintiff's disabilities until trial and, thus, we believe there is no basis for a monetary award for this time period.

Several factors persuade the Court that an award for the future value of household services would also be inappropriate in this case. These include: (1) the Plaintiff's husband's ability to perform these chores, especially since he will not be working and moreover, will no longer be required to provide "nursing care" for the Plaintiff; (2) Lucy's increased ability to undertake these tasks in view of the proposed architectural changes in the McDonald home for which compensation has been granted by the Court; and (3) the capability of a minimum wage-worker, for which sufficient damages have also been awarded to employ under the nursing care category heretofore discussed,[68] to render some assistance with these services. With these considerations in mind, the Court concludes that the value of the Plaintiff's household services is not a compensable element of damages in this case.

The total lost earnings of the Plaintiff are as follows:

| | |
|---|---|
| Past Earnings | $ 44,800.00 |
| Future Earning Capacity | 437,209.00 |
| Fringe Benefits | 72,301.35 |
| TOTAL | $554,310.35 |

### 4. Pain and Suffering

The final element of damages to be awarded is compensation for the past, present and future pain and suffering of the Plaintiff as a result of her affliction with GBS. *Connolly v. Philadelphia Transportation Co.,* 420 Pa. 280, 288, 216 A.2d 60

(1966). Under Pennsylvania law, such an award should include compensation for a Plaintiff's physical pain and suffering, as well as for any mental anguish, inconvenience, disfigurement, humiliation and the loss of enjoyment of life. See *Frankel v. Heym, supra; Funston v. United States, supra,* 513 F.Supp. at 1010; see generally *Pennsylvania Suggested Standard Jury Instructions: Civil, supra* at §§ 6.01 E-I. The nature of pain and suffering is such that there is no legal yardstick by which to measure accurately reasonable compensation for it, *Herb v. Hallowell,* 304 Pa. 128, 133, 154 A. 582 (1931); thus, we are confronted with the unenviable task of dispassionately translating "such catastrophic human loss as [the Plaintiff] suffered into money damages. In this process systematic logic is not helpful and precision is not achievable." *Frankel v. Heym, supra,* 466 F.2d at 1228.

In view of the Court's previous discussion, there is no need to set forth in detail the devastation that has beset Lucy McDonald as a result of the swine flu vaccine. She presently is and will permanently continue to be totally dependent on others for virtually every intimate aspect of her everyday life. She will require extensive future medical care but, even with this, she is highly susceptible to infection and illness. She will never again be able to walk or engage in any activity requiring the use of her lower extremities; her legs are simply useless. She has been unable in the past six years to attend church or any social activities for fear of becoming incontinent. She has become, in Dr. Lichtenfeld's words, a "prisoner to her physical condition, humiliation and embarrassment." Additionally, the job she enjoyed and the career she looked forward to are gone. More importantly, the joys of motherhood, a prospect she so fondly embraced, will never be known to her. Even a normal marital relationship with her husband is now impossible. Quite naturally, there has been an extreme transformation in Lucy McDonald's emotional well-being—from an af-

---

68. See Part B, § 2(b) of this Opinion, *supra.*

fable, happy-go-lucky active person to an invalid, greatly disturbed by acute depression and a severe loss of self-esteem and dignity. Reflecting her religious background, Lucy ascribes the present torment to her "penance on earth."

Under these circumstances, we believe that a substantial award as compensation for Lucy McDonald's pain and suffering is warranted. In so doing, we share the sentiments of the Court in *Barnes, supra,* that "[m]oney is not a substitute for what she and her family have lost, but nevertheless Congress provided for such an eventuality in the legislation creating the National Swine Flu Immunization Program of 1976 ...." 516 F.Supp. at 1390. The sum of $600,000.00 is awarded as just and reasonable compensation for pain and suffering.

A summary of the damages (rounded off to dollars) to be awarded the Plaintiff is as follows:

| | |
|---|---|
| Past Medical Expenses | $ 56,645.00 |
| Future Medical Expenses | |
|   a. Medical Treatment | 197,749.00 |
|   b. Nursing Care | 2,228,096.00 |
|   c. Miscellaneous Equipment | 257,670.00 |
|   d. Architectural Changes | 77,000.00 |
| Lost Earnings | 554,310.00 |
| Pain and Suffering | 600,000.00 |
| TOTAL | $3,971,470.00 |

### 5. Delay Damages

As an additional element of compensation, the Plaintiff requests an award of delay damages pursuant to Pennsylvania Rule of Civil Procedure 238.[69] Section 2674 of the Federal Tort Claims Act (FTCA) provides, in pertinent part, that:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, *but shall not be liable for interest prior to judgment or for punitive damages.* (emphasis added).

As previously noted, the Swine Flu Act provides that a claim for any injury sustained from the swine flu program must be brought directly against the United States under the procedures of the Federal Tort Claims Act. See *Dipippa v. United States,* 687 F.2d 14, 16 (3d Cir.1982). Specifically, the legislation states that:

The United States shall be liable ... for personal injury or death arising out of the administration of swine flu vaccine under the swine flu program and based upon the act or omission of a program participant *in the same manner and to the same extent as the United States would be liable in any other action brought against it under ... [28 U.S.C.] section 1346(b) and chapter 171 [28 U.S.C. § 2671–80] ....*

42 U.S.C. § 247b(k)(2)(A) (emphasis added).

Despite this unequivocal language seemingly directing a Court to apply those provisions of the FTCA which would affect the "extent" of the liability of the United States, the Plaintiff contends that the statutory bar against prejudgment interest contained in § 2674 of the FTCA need not be applied in a Swine Flu Act claim. She argues that in such an action, the United States is "merely a surrogate defendant

---

**69.** Rule 238 provides, in relevant part:
(a) Except as provided in subdivision (e), in an action seeking monetary relief for bodily injury, death or property damage, or any combination thereof, the court... shall
(1) add to the amount of compensatory damages ... in the court's decision in a nonjury trial, damages for delay at ten (10) percent per annum, not compounded, which shall become part of the award, verdict or decision;
(2) compute the damages for delay from the date the plaintiff filed the initial complaint in the action or from a date one year after the accrual of the cause of action, whichever is later, up to the date of the award, verdict or decision.

    \*     \*     \*     \*     \*     \*

(e) If a defendant at any time prior to trial makes a written offer of settlement in a specified sum with prompt cash payment to the plaintiff, and continues that offer in effect until commencement of trial, but the offer is not accepted and the plaintiff does not recover by award, verdict or decision, exclusive of damages for delay, more than 125 percent of the offer, the court ... shall not award damages for delay for the period after the date the offer was made.
Counsel for the Plaintiff has filed an affidavit in which he states that at no time did he or his client receive any offer of settlement from the Defendant either in written or oral form (Document # 89).

who has retained a right of indemnity" against the private program participants [70] and, accordingly, the application of § 2674 would frustrate the congressional intent of the Swine Flu Act "to make the Plaintiffs whole according to the substantive law of the state in which an action accrued",[71] since Rule 238 has been deemed to be substantive in nature under *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). See *Jarvis v. Johnson,* 668 F.2d 740 (3d Cir.1982). Moreover, she asserts that since the Swine Flu Act incorporated only the "procedural aspects" of the FTCA, section 2674, which itself "embodies obvious elements of substantive law", need not be followed in such an action.[72]

While the Plaintiff's arguments have superficial appeal, nonetheless, we believe that the unambiguous language of the Swine Flu Act as well as the decisional law of this circuit necessitates our denial of her request for delay damages pursuant to Rule 238. In *Dipippa v. United States, supra,* the Third Circuit recently examined the language and intent of the swine flu legislation:

In the Swine Flu Act, Congress sought to implement a national vaccination program in response to the perceived threat of a national flu epidemic. In doing so, it strove both to immunize manufacturers from any liability for injuries allegedly sustained from the vaccination program and to provide just compensation for any such injury . . . To achieve these two goals, the United States substituted itself as defendant in all potential swine flu claims, . . . made itself amenable to suit under the FTCA, . . . and made this the exclusive remedy for all swine flu claims, . . . except where an alternate and exclusive method of compensating the injury existed under prior law . . . .

687 F.2d at 17 (citations omitted). Although the factual setting and questions presented in *Dipippa* were dissimilar than those now before us, the Court's discussion does, however, provide some guidance on the instant issue. In that case, the Plaintiff, a federal employee who had received the swine flu inoculation on federal premises during working hours, sought to avoid the exclusivity provisions of the FECA [73] liability scheme by arguing, *inter alia,* that "Congress did not intend for FECA to bar a tort claim based on the acts and omissions of the program participants." *Id.* at 18. The Court rejected this contention, stating that the "suit is not against a third party, but directly against the United States, as the plain language of the Swine Flu Act expressly requires." *Id.* at 17.[74]

With respect to the question in this case, the "plain language" of the Swine Flu Act, as noted above, similarly requires that the liability of the United States be limited to the "same extent" as in any other action under the FTCA. See 42 U.S.C.

---

70. See 42 U.S.C. § 247b(k)(7).

71. Plaintiff's Memorandum of Law (Document # 76) at 9; see *Hunt v. United States,* 636 F.2d 580 (D.C.Cir.1980).

72. *Id.* at 8, 9; see *United Missouri Bank South v. United States,* 423 F.Supp. 571 (D.Mo.1976).

73. Federal Employees Compensation Act, 5 U.S.C. § 8101 *et seq.*

74. The Court in *Dipippa* also relied upon two Ninth Circuit decisions holding that FECA bars claims based on the negligence of federal drivers under the Federal Drivers Act, 28 U.S.C. § 2679 (1966). See *Van Houten v. Rails,* 411 F.2d 940 (9th Cir.), *cert. denied,* 396 U.S. 962, 90 S.Ct. 436, 24 L.Ed.2d 426 (1969); *Noga v. United States,* 411 F.2d 943 (9th Cir.), *cert. denied,* 396 U.S. 841, 90 S.Ct. 104, 24 L.Ed.2d 92 (1969). That Act "provided the 'pattern' after which Congress fashioned the 'unusual, though not unique manner' by which the Government assumed liability for the acts of program participants in the swine flu program." 687 F.2d at 18. See Baynes, *Liability for Vaccine Related Injuries: Public Health Considerations and Some Reflections on the Swine Flu Experience, supra* at 66–67. Using the Federal Drivers Act as a model, Congress also passed legislation immunizing the medical personnel of the Veterans' Administration, 38 U.S.C. § 4116 (Supp. III, 1973), and the Public Health Service, 42 U.S.C. § 233 (1970). *Thomason v. Sanchez,* 539 F.2d 955, 958 (3d Cir. 1976), *cert. denied,* 429 U.S. 1072, 97 S.Ct. 809, 50 L.Ed.2d 790 (1977). We are not aware of any decisions allowing prejudgment interest or punitive damages under these similar statutory provisions.

974

§ 247b(k)(2)(A). Such explicit statutory direction compels this Court to conclude that encompassed within this congressional limitation is the prohibition against prejudgment interest, as set forth in section 2674 of the FTCA. It is well settled that interest prior to judgment is not recoverable in other actions brought pursuant to the Federal Tort Claims Act. *Reminga v. United States,* 448 F.Supp. 445, 470 (W.D.Mich. 1978), *aff'd,* 631 F.2d 449 (6th Cir.1980); *Domangue v. Eastern Airlines,* 542 F.Supp. 643, 655 (E.D.La.1982); *Reuter v. United States,* 534 F.Supp. 731, 732 (W.D.Pa.1982).

This apparently is an issue of first impression, as revealed by the briefs of both litigants as well as our independent research. We do note, however, that our Court of Appeals has recognized the applicability of the "punitive damages" bar of section 2674 in a Swine Flu Act case. *Barnes v. United States, supra,* 685 F.2d at 68 ("We agree with the government's choice of the controlling legal precept regarding punitive damages in Federal Tort Claims Act cases, 28 U.S.C. § 2674 ..."). See also *Funston v. United States, supra,* 513 F.Supp. at 1009. In view of such recognition, we can discern no sound reason why our appellate court would not also adopt the prohibition against prejudgment interest portion of that same statute, 28 U.S.C. § 2674, as the "controlling legal precept" in Swine Flu Act cases.

For the foregoing reasons, the Plaintiff's request for delay damages pursuant to Pennsylvania Rule of Civil Procedure 238 will be denied.

## IX. CONCLUSION

The Court is not unaware of the unusual length of this Opinion. We are mindful too of the exceptional size of the award of damages. But we are equally cognizant of, and deeply impressed, with the enormous impact of the Plaintiff's extensive injuries. No smaller award could adequately compensate her since her total life, as well as her body, has been drastically and permanently crippled. We have tried, then, in fairness to both parties, to be thorough and complete in laying out our reasoning and analysis of the testimony and the evidence presented in this case.

Based on the foregoing, the Court makes the following conclusions of law:

1. The Plaintiff Lucy McDonald is suffering from Guillain-Barre Syndrome.
2. The swine flu inoculation she received on November 14, 1976 caused the Plaintiff's Guillain-Barre Syndrome.
3. The Defendant United States of America is liable to the Plaintiff Lucy McDonald for the damages she suffered as a result of the Guillain-Barre Syndrome caused by the swine flu inoculation.
4. The Plaintiff's motion to amend the administrative claim and ad damnum clause of the Complaint pursuant to 28 U.S.C. § 2675(b) is granted.
5. The Plaintiff Lucy McDonald is entitled to an award of $3,971,470.00 as damages.

An appropriate Order constituting the Court's Verdict in this case will be entered.